Appeal No. 2013-3137

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

# 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

PAULA JO HEARN,

*Petitioner,*

– v. –

DEPARTMENT OF THE ARMY,

*Respondent,*

– and –

MERIT SYSTEMS PROTECTION BOARD,

*Intervenor.*

PETITION FOR REVIEW OF THE MERIT SYSTEMS PROTECTION
BOARD IN NO. NY0371120120-L-1

## BRIEF FOR PETITIONER

CHRISTEN ARCHER PIERROT
CHIACCHIA & FLEMING, LLP
5113 South Park Avenue
Hamburg, New York 14075
(716) 648-3030

*Attorneys for Petitioner*

December 30, 2013

Form 9

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Paula Jo Hearn _____ v. Department of the Army _____

No. 13-3137 _____

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Christen Archer Pierrot _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Paula Jo Hearn

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

_____

4. ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

N/A

_____

December 30, 2013 _____

Date

/s/Christen Archer Pierrot _____

Signature of counsel

Christen Archer Pierrot _____

Printed name of counsel

Please Note: All questions must be answered

cc: _____

124

# TABLE OF CONTENTS

Table of Authorities …………………………………………….    iii

Statement of Related Cases…………………………………….. v

Jurisdictional Statement …………………………………………... 1

Statement of Issues Presented for Review...…………………………… 2

Statement of the Case …………………………………………….. 4

Statement of Facts …………………………………………… 6

Summary of Argument …………………………………………. 20

Argument…………………………………………………………... 21

Standard of Review …………………………………………….... 21

POINT I:    THE AGENCY IS PREVENTED FROM TAKING A SUITABILITY ACTION AGAINST MS. HEARN INASMUCH AS 5 CFR 731.105 PRECLUDES AN AGENCY FROM TAKING A SUITABILITY ACTION AGAINST AN EMPLOYEE …………………… 21

POINT II:    EVEN IF THIS COUT HOLDS THAT THE ACTION IS PROPERLY A SUITABILITY ACTION THE AGENCY FAILED TO CONSIDER ALL AVAILABLE INFORMATION BEFORE MAKING ITS DETERMINATION ……………………… 27

POINT III:    EVEN IF THIS COURT DETERMINES THAT THE PROCEDURAL ERRORS WERE SOMEHOW HARMLESS, SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE DETERMINATION THAT THERE IS A NEXUS BETWEEN MS. HEARN'S PAST MISCONDUCT AND THE EFFICIENCY OF SERVICE OF THE CORPS OF ENGINEERS …………… 30

**Table of Contents, Cont.**

POINT IV:   THE PENALTY OF TERMINATION IS AN ABUSE OF
DISCRETION AND ARBITRARY AND CAPRICIOUS
INASMUCH AS THERE IS NO RATIONAL CONNECTION
BETWEEN THE GROUNDS CHARGED AND THE INTEREST
ALLEGEDLY SERVED BY THE SANCTION …………..   33

POINT V:   THE AGENCY NEVER CONSIDERED THE DOUGLAS
FACTORS AND THE BOARD FAILED TO CONSIDER ALL OF
THE RELEVANT DOUGLAS FACTORS …………………   35

POINT VI:   MS. HEARN'S APPEAL WAS TIMELY FILED INASMUCH AS IT
WAS TIMELY FILED WITHIN SIXTY DAYS OF HER RECEIPT
OF THE DECISION …………………………………………   49

POINT VII:   THE PRESUMPTION THAT A REGISTERED E-FILER
RECEIVES SIMULTANEOUS NOTICE OF DOCUMENTS FILED
BY THE BOARD IS A REBUTTABLE PRESUMPTION …   53

Conclusion……………………………………………………………   57

Certificate of Service

Certificate of Compliance

# TABLE OF AUTHORITIES

## CASES:

Brown v. Dep't of Navy,
229 F.3d 1356 (Fed.Cir.2000)……………………………………… 30-31

Dep't of the Navy v. Egan,
484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) …………………… 30

Douglas v. Veterans Administration,
AT075299006 (MSPB 1981) ……………………………………… 33, 39

Grebosz v. United States Civil Service Commission,
472 F.Supp. 1081 (S.D.N.Y. 1979) ……………………………… 31-32

Hayes v. Dep't of Navy,
727 F.2d 1535 (Fed. Cir. 1984) ………………………………….. 30

Lachance v. Devall,
178 F.3d 1246 (Fed.Cir.1999)……………………………………. 31

Merritt v. Department of Justice,
Docket No. PH075209058 (MSPB 1981)………………………… 31

Monzo v. Dept. of Transportation,
735 F.2d 1335 (Fed. Cir. 1984)………………………………..… 49-50

Oja v. Dept. of Army,
405 F.3d 1349 (Fed. Cir. 2005)…………………………………. 49

Pope v. United States Postal Serv.,
114 F.3d 1144 (Fed.Cir.1997)…………………………………… 30

Young v. HUD,
706 F.3d 1372 (Fed. Cir. 2013)……………………………….. 24-25

<u>**STATUTES**</u>

5 U.S.C. § 7513 (2000) …………………………………..…………… 1, 23, 30

5 U.S.C. § 7701 (2000)……………………………………………… 30

28 U.S.C. § 1295 (2000)…..………………………………………. 1

5 CFR 315.805 (2008) …………………………………………… 22-23

5 CFR 731.105 (2008) …………………………………………1, 21-23

5 CFR 752.402 (2009) …………………………………………… 23

5 CFR 1201.3 (2008)…………………………………………….. 1

5 CFR 1201.14 (2012) ..…………………………………..……… 50, 54

<u>**OTHER AUTHORITY**</u>

OPM's Federal Personnel Manual……………………..……………… 33

## STATEMENT OF RELATED CASES

Appellant hereby asserts that there are no related cases.

# <u>JURISDICTIONAL STATEMENT</u>

The Merit Systems Protection Board has jurisdiction to hear an appeal regarding both an adverse action taken against an employee, pursuant to 5 U.S.C. 7513(d) and 5 CFR 1201.3, and a suitability action taken against an applicant, appointee, or probationary employee, pursuant to 5 CFR 315.805 and 5 CFR 1201.3.

This Court has jurisdiction to hear an appeal of the MSPB's final decision, pursuant to 28 U.S.C. 1295(a)(9).

The MSPB issued its final decision by mail to the appellant, Ms. Hearn, on April 26, 2013. She received same on or about May 3, 2013. Ms. Hearn's Petition for Review was received, accepted, and deemed filed by the Federal Circuit Court of Appeals' Clerk on June 26, 2013. Because Ms. Hearn's appeal was filed within sixty days of her receipt of the decision, it is timely.

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

I.  Can an agency take a suitability action against a reinstated career employee?

Answer below: Yes.


II. Must an agency consider the nature of an employee's position and contributing societal conditions  in determining whether prior conduct interferes with the agency's efficiency of service?

Answer below: No.


III. Is there a sufficient nexus between an employee's past misconduct for another employer and efficiency of service for a current employer where the past misconduct was committed in previous employment more than four years earlier; was committed under isolated and unique circumstances which are unlikely to ever be repeated; bears no relationship to the duties or responsibilities of the employee's current position; and was committed by a long-term employee with more than 22 years of satisfactory and competent government service?

Answer below: Yes.


IV. Is the penalty of termination of a career long-term employee for having committed misconduct in prior employment, four years before her current employment, an abuse of discretion where the past misconduct was committed under isolated and unique circumstances which are unlikely to ever be repeated; the past misconduct bears no relationship to the duties of the employee's current position; and where a warning to the employee would have sufficed to put her on notice that such conduct would not be tolerated in the future?

Answer below: No.

## **Statement of Issues Presented for Review, Cont.**

V.      Is the decision to terminate a career long term employee an abuse of discretion where the relevant Douglas Factors were not considered?

Answer below: No.


VI.     Is an appeal of an agency decision timely filed where it is received and filed by the Clerk of the Court for the Federal Circuit Court of Appeals within sixty days of the day that the party-appellant received the decision?

Answer below: Issue did not arise until this appeal.


VII.    Is the presumption that an MSPB registered e-filer receives a document, or notice thereof, at the time that the document is filed a rebuttable presumption where the registered e-filer has no record of having received an e-mail notification regarding the filing; where the credible evidence establishes that the registered e-filer did not log into the MSPB repository to access the decision; and, further, where the registered e-filer recalls the decision having been received in the mail?

Answer below: Issue did not arise until this appeal.

## STATEMENT OF THE CASE

This case regards the removal of a federal career employee from a non-probationary position for which she had been hired and which she was successfully serving in for over five months' time without incident. Despite her successful performance, Ms. Hearn was erroneously determined to be a probationary employee who could be summarily removed from service for any reason. On or about February 10, 2012, the decision to remove her, *as a result of conduct that occurred four years prior*, was finalized. [A-45-47, A70-72.] She was removed, effectively, on February 24, 2012, without having been given the appropriate due process to which she was entitled.

On or about March 19, 2012, Ms. Hearn timely commenced the MSPB appeal of the Respondent's removal of her from service. [A-38.] After a hearing, an audio recording of which is included in the Appendix to be later filed with the Court and which is cited to herein as "HCD", the Administrative Law Judge (hereinafter "ALJ"), on July 17, 2012, confirmed that Ms. Hearn was not a probationer, but an employee. [A-1-34, 1131.] Surprisingly, however, the ALJ went on to classify Ms. Hearn's appeal as one regarding a suitability action, rather than an adverse action, despite the fact that an Agency cannot take a suitability action against an employee. Ultimately, she held that the Agency's removal of Ms. Hearn was not improper.

On or about August 20, 2012, Ms. Hearn timely sought further review from the MSPB. [A-1133.] On April 26, 2013, the MSPB rendered its final determination affirming the ALJ's decision. [A-1191-1199.] The decision was mailed to Ms. Hearn.

Ms. Hearn received the MSPB's final decision, dated April 26, 2013, on or about May 3rd. *See* Docket No. 1. Less than sixty days later, on June 26, 2013, Ms. Hearn timely commenced her appeal with this Court by filing a Petition for Review with its Clerk. The Clerk accepted Ms. Hearn's filing and this action was initiated.

# STATEMENT OF FACTS

Ms. Hearn began her federal career on January 5, 1986. [A-975.] Her

employment continued, uninterrupted, until October of 2008, for a total of over 22

years of service. [HCD 5:38:08; A-975.] This service included 13+ years of

service at the Department of Homeland Security – Immigration and Customs

Enforcement ("DHS-ICE") in the Batavia offices. [HCD 5:40:42; A-975.] During

her employment at DHS-ICE, Ms. Hearn received multiple awards (3 special

achievement, sustained superior performance, certificate of achievement, and

outstanding performance). [A-629.] Ms. Hearn also received two letters of

recommendation, one from FAUSA Denise O'Donnell and one from USA Patrick

NeMoyer, and multiple outstanding performance evaluations. [A-629-631.] In

1999 Ms. Hearn received a gift card from a vendor which Ms. Hearn promptly

returned due to a conflict of interest and the appearance of impropriety. [A-557,

630.]

Ms. Hearn began her employment in Batavia in December 1997. [A-975.]

Her immediate supervisor would start there just shortly after. Right from the onset,

Ms. Hearn "butted heads" with her supervisor. [HCD 5:42:02.] The conflicts were

kept in check by Ms. Hearn's second and third line supervisors until sometime

around May of 2006 [HCD 5:42:20.] At that time there was an event called the

"Kid's Day Operation" initiative. A memo came down from Secretary Chertoff,

the then-Secretary of Homeland Security, who encouraged people to volunteer for this initiative. [HCD 5:42:25.] As time and attendance clerk, Ms. Hearn was responsible for keying timesheets. [HCD 5:42:48.] The Kid's Day operation was held on May 26, 2006. May 30, 2006 was the end of the pay period. As Ms. Hearn was receiving timesheets, she noticed that employees, including her own supervisors, were putting in for overtime and what is referred to as AUO – Administrative Uncontrollable Overtime – for their participation in the Kid's Day Operation. [HCD 5:43:50.] As time and attendance clerk and with her knowledge and experience regarding same, Ms. Hearn did not believe that one could be paid premium wage for volunteer work, which is what the Kid's Day Operation was. [HCD 5:43:12.] As a result, Ms. Hearn brought the overtime claims to the acting facility director's attention. He agreed with her that the overtime claims were improper, told her that he was going to make some phone calls, and then returned later on to advise that, per the actual facility director, she should simply key the times in as they were claimed for. [HCD 5:43:28.] Ms. Hearn did not feel comfortable with that, but she had been ordered to do it and so she did. [HCD 5:43:44.] However, Ms. Hearn did report the situation to her ethics officer. [HCD 5:43:47.] The following day, Ms. Hearn received a number of "corrected" timesheets from her staff. [HCD 5:44:18.] Subsequently, Ms. Hearn was ostracized by her peers and supervisors. [HCD 5:44:24.]

7

Within a few months of the Kid's Day Operation, Ms. Hearn was tasked with pulling timesheets for some sort of audit that was being done. [HCD 5:44:53.] Ms. Hearn complied and provided the information to the Deputy Facility Director at the time. [HCD 5:45:00.] Shortly thereafter, Ms. Hearn was disciplined for failure to complete a separate and unrelated assignment when she refused to, once again, violate agency rules and regulations in the completion of same. [HCD 5:45:23; A-968.] Critically, the deciding official for that disciplinary action happened to be the same person who was involved with the Kid's Day Operation and who had apparently promised employees that they would be paid overtime for their work on same. [HCD 5:45:28.] Understandably so, Ms. Hearn did not believe she would receive a fair or unbiased decision. [HCD 5:45:29.]

Ms. Hearn became angry, distressed, and frustrated as a result of the retaliation that she was subjected to following her whistleblowing on the improper claims for overtime compensation. [HCD 5:45:46.] She sought assistance from her union and from her EEO office. [HCD 5:45:50.] In or around late September 2007, the phone vendor, John Marranca, who possessed the proper vender credentials to access a secure facility and who had the ability to access the system remotely if need be, came into the office to do some routine maintenance on the phone system. [HCD 5:46:16] As a result of how visibly distraught Ms. Hearn was, Mr. Marranca struck up a conversation, during which he offered to set up the

8

system in order to allow Ms. Hearn to be able to listen in on her supervisors'

telephone calls. Ms. Hearn refused. However, Mr. Marranca made the adjustments

anyway. [HCD 5:46:32] Shortly thereafter, Ms. Hearn caved and made the

decision that would change her life for the worse: She began monitoring her

supervisors in an attempt to obtain information regarding herself; her

whistleblowing complaint(s); and the discipline that she was facing for her recent

alleged failure to complete an assignment.

At no time did Ms. Hearn misappropriate confidential, official, secure, or

otherwise classified information. [A-558.] Nor did she disclose any information

regarding anything other than herself personally. Ms. Hearn was not committing

espionage or treason or any other act with the intention of harming the

government, the public, or any other person. [A-969] Indeed, she was acting out of

desperation and only with an interest in protecting her 22 year long career. As

ironic as it may be that her actions were in violation of the law, Ms. Hearn only

found herself in that position *because* she was the honest, loyal, upstanding

employee who spotted and reported fraudulent overtime claims in the first

instance.

The monitoring continued until approximately early January 2008, when she

found out that she would be suspended for one week without for the alleged failure

to complete an assignment charge. Indeed, there was no reason to continue

9

monitoring since Ms. Hearn believed the situation had been resolved. She served her suspension on January 22, 2008, however, the hostile work environment and retaliation against her persisted. [A-761.] In February 2008, Ms. Hearn was contacted by a telephone vendor who had configured the telephone system for monitoring and questioned about same. Concerned by the phone call, Ms. Hearn immediately went to her supervisors and confessed what she had done. Importantly, DHS-ICE did not terminate her employment. Instead, in March 2008, Ms. Hearn left DHS-ICE to begin employment with another agency with the Department of Homeland Security, the Citizenship and Immigration Services unit (DHS-CIS). [HCD 5:47:12; A-975.]

In August 2008, Ms. Hearn was served with a criminal complaint, a misdemeanor charge for violation of 18 U.S. Code, Section 1030(a)(2)(B). In October 2008, Ms. Hearn resigned from DHS-CIS on her own volition and in an attempt to save both the Agency and herself from embarrassment. [HCD 5:47:46.]

On December 30, 2008, the criminal complaint was dismissed and she pled guilty to single count information – a violation of the same section of title 18, access of a computer without authorization. [A-955.]

Ms. Hearn's criminal attorney explained the situation to Federal Magistrate Judge McCarthy as follows:

> What happened here, Judge, is that when Ms. Hearn was working with the federal detention center in Batavia, the person who ran that

facility, a fellow who is retired, whose last name I think is Mule, wanted some of the employees to work for a program called Kid's Day, and he wanted to reward the employees that worked for Kid's Day by paying them for the time that they invested in the Kid's Day Program.

Ms. Hearn, being a by-the-letter employee, advised Mr. Mule that would be improper; that you can't pay federal employees for volunteer work.

She stuck to her guns; Mr. Mule investigated it and, in fact determined that she was right. So as it turned out, none of these employees got paid for their volunteer work, and it was her after that who became ostracized by just about everybody out at the detention center because she had followed the rule of the regulations.

There was a second problem that arose about a year later when her immediate supervisor wanted to put confidential information on a shared drive, and Ms. Hearn declined to do that because, in her view, that again would violate the regulations.

As a result of her declination to do that, she was disciplined. It was this disciplinary process that led to her misinformed decision to listed in on these telephone conversations . . .

Your Honor, there's no one that suggests that she misused this information that she overheard in any fashion. It was simply a question of curiosity that caused her to do it.

[A-558-559.]

Ms. Hearn was sentenced that very same day to only pay a fine of $2,500.

Per Judge McCarthy, this was the appropriate sentence under the circumstances in

this case. [A-972, 934.]  She was encouraged by both her counsel and the federal

Magistrate Judge, with no objection by opposing counsel, to apply for a New York

State Certificate of Relief from Disabilities. This Certificate precludes an employer from using Ms. Hearn's conviction as either a basis to not hire her or as a basis to terminate her employment. [A-560.] Judge McCarthy specifically stated that if it was in his power to do so, he would grant the Certificate. [A-971-972.] In order to receive the NYS Certificate of Relief from Disabilities Ms. Hearn met with a NYS Parole Officer, Karl Josker, who conducted an investigation which included an in-depth interview of Ms. Hearn. During that interview, he encouraged her, based on the circumstances, to apply for jobs back in the federal government. [HCD 5:49:43.] Ms. Hearn received the Certificate of Relief from Disabilities in December of 2010. [A-565.]

On or about July 3, 2011, nearly four years after she engaged in the criminal misconduct at Batavia, Ms. Hearn applied for a Program Analyst Position with the Corps of Engineers, a civilian position within a civilian agency. She was one of approximately twenty applicants. [HCD 3:35:23.] She was interviewed by Deborah Czombel and others on July 20, 2011 and almost immediately thereafter was deemed the most qualified applicant and was selected for the job. [HCD 3:35:50.] A week or two later, Ms. Hearn filled out the required paper work, including the SF 85 (Questionnaire for Non-Sensitive Positions) and the OF 306 (Declaration for Federal Employment), both of which were electronically signed and submitted on August 8, 2011. The latter disclosed her conviction. [A-936, 843.]

Because of their close relationship (indeed, Ms. Hearn and Ms. Czombel lived together for a period of time when Ms. Hearn was getting divorced and Ms. Hearn later stood up as an attendant in Ms. Czombel's wedding [A-1155]), Ms. Hearn listed Deborah Czombel as one of her references that "knew her well" on her employment paperwork. [A-946.] Ms. Hearn further used Ms. Czombel as a reference for the investigation conducted on her request to receive the Certificate for Relief from Disabilities. [HCD 5:51:00.]

Ms. Czombel, however, would come to testify that she and Ms. Hearn were just mere acquaintances, instead of the long-time friends that they were. This is relevant, of course, because Ms. Czombel dishonestly took the position that she had no idea at the time that Ms. Hearn was interviewing or being hired that Ms. Hearn had pled guilty to a crime in federal court the year before. Ms. Hearn vigorously disputes this fact and sought to introduce evidence during the hearing to rebut Ms. Czombel's assertions otherwise, however, the ALJ overruled Ms. Hearn's requests to either call the witnesses or introduce affidavits from them. [A-1155-1157.] Of course, this evidence overwhelmingly demonstrates that Ms. Czombel's veracity and credibility are both at stake.

***It is Ms. Hearn's position that Ms. Czombel unequivocally knew of Ms. Hearn's prior conviction at the time she was interviewed and that Ms. Hearn was subsequently hired for the position, regardless – one out of twenty plus***

13

**candidates – because of two very explicit reasons: Ms. Hearn was best qualified for the position and her prior isolated actions were not any sort of concern in her new employment setting.**

Around August 8, 2011, Ms. Hearn was fingerprinted by Security Officer Patrick Vanderbeck and Ms. Hearn officially entered on duty on August 22, 2011. [HCD 5:53:40; A-839.] For five months Ms. Hearn performed her work successfully and competently and without any incidents or concerns, until, out of the blue, on January 5, 2013, she was served with the now-infamous memo proposing her removal. [A-45] Critically, prior to that time, Ms. Hearn had absolutely no idea that there was any problem with her employment as no one had ever communicated to her that there was an issue. [HCD 6:01:09.]

The Corps of Engineers made the decision to unilaterally and summarily remove Ms. Hearn in the way that it did because it erroneously believed her to be a probationary appointee. [A-45, 839-841.] This is not only obvious from the language of the removal memo, but the error was confirmed by the testimony of the proposing official, Deborah Czombel. [HCD 3:39:55.] There can be no dispute, however, that Ms. Hearn was at all times herein an employee according to 5 U.S.C. 7511(a)(1)(A), entitled to rights above and beyond those of a probationary appointee. [A-1094.] The Corps of Engineers does not dispute that it was mistaken about Ms. Hearn's employment status and her corresponding rights. [A-70.]

However, the Department did nothing to correct or modify its procedural and substantive defects in that regard.

Ms. Hearn was removed from her employment all without ever being spoken to about the very issue that the Department was concerned about. [HCD 1:29:35, 3:43:50.] She was never interviewed. She was never given an opportunity to be heard orally on the charges presented against her. [HCD 1:29:35, 3:43:57, 4:53:36.] She was never offered the chance to explain what had happened or to provide assurances that such a mistake would never occur again in the future. The Agency's actions were procedurally defective; hasty; an overreaction; and unnecessary. Indeed, Ms. Hearn has never had an interest in harming the government, the public, her colleagues, or her employer. [HCD 6:02:14] She has never had an interest in undermining governmental operations or missions. Instead, she has acted to preserve integrity – albeit making a poor decision in the very thick of that ugly and retaliatory situation. Even further, however, Ms. Hearn did not possess the wherewithal or expertise to adjust the phone systems and the sole reason she was ever able to do so was because of the unilateral offer from the telephone vendor. None of the circumstances present at Batavia that both drove Ms. Hearn to exercise poor judgment and allowed her to actually commit the acts that she did would ever be likely to be repeated. And, even to the infinitesimal extent that the situation could recreate itself, Ms. Hearn would have gladly and

vigorously reassured anyone that she had learned her lesson and would never risk her career, resources, and livelihood by repeating such actions in the future. [HCD 6:02:55.]

Here, and at most, all the Department needed to and should have done was put Ms. Hearn on notice that it *knew* of her prior actions and then *warn* her that such actions would not be tolerated. Of course, it remains the Appellant's position that such a conversation would have been preaching to the choir inasmuch as Ms. Hearn never intended to pull another stunt like she had in the past, but it would have served the purpose of a further assurance that Ms. Hearn would not commit another offense. This is especially so since the record makes very clear that Ms. Hearn was allowed to continue working, uneventfully and successfully, for five months after the Department first began its investigation, unbeknownst to her, into her background. [HCD 5:01:05.] Indeed, for the first few months, Ms. Hearn had full computer access in accordance with her non-sensitive, low risk position classification, which did not require any sort of security clearance. [HCD 1:38:59.] For the latter half of her employment, *but also unbeknownst to her*, her access had been severely restricted by the Department. [HCD 2:15:43.] In addition, her activity was monitored for inappropriate activity by the Agency. Finally, the Agency had a specialty team check to see if Ms. Hearn had done anything to the system and found she had not. [HCD 4:45:10.]

Most critically, though, at all times herein and despite the restrictions placed on her and the monitoring of her, Ms. Hearn was able to and did effectively perform her work, without incident or compromise, and all without knowing that there was any controversy surrounding her employment. [HCD 1:35:46.] This further contradicts the Agency's argument that it could not mitigate the penalty of termination in order to address its concerns. To be sure, if Ms. Hearn was able to perform her work without ever knowing that her computer access was severely restricted or that she was being monitored, the Agency simply could have continued restricting her access. Even the Agency's own witness, Andrew Bolya, admitted on cross-examination that mitigation *could* be accomplished (and, in fact, was accomplished). [HCD 2:15:43, 2:29:20.] He conceded that they could monitor and the capacity was there to "watch" her. [HCD 2:32:19-2:33:08.] Even the Agency's own regulations authorize monitoring of employees' computer usage and specifically provide that such monitoring may be "automated, real or near-real time interception of information transiting the system or network by a system or network administrator . . ." [A-258.]

Furthermore, at all times herein, Ms. Hearn behaved appropriately, responsibly, and was free from any discipline or other issues, without even having to be put on notice that she was being "watched." There was no emergent need to remove her from service as a result of something that occurred four years prior, nor

17

was there any other security violation committed by her during the course of her
tenure with the Agency. [HCD 1:36:42.]

The Agency, however, has taken the position that Ms. Hearn posed a great
threat to its security of non-sensitive and non-classified information. In making this
argument, the Agency has stressed that Ms. Hearn, in her non-sensitive and low
risk position, still had access to Federal Official Use Only ("FOUO") information,
which if leaked would cause the Agency embarrassment.  [HCD 4:35:55.]The
Agency's determinations in this regard do not pass muster. Ms. Hearn, despite
having improperly eavesdropped on her supervisors four years prior, never
disclosed any confidential or other information to anyone. She was not operating to
undermine her employer or the government. She had no interest in causing
embarrassment or compromising her employer's mission or service. In fact, the
situation that led to her behavior was just the opposite; she had been acting with
the government's and taxpayers' best interests at heart in working to prevent
improper overtime usage. Because Ms. Hearn never once disclosed confidential,
secure, or FOUO information in the past, it is wholly erroneous for the Agency to
reach the conclusion that she somehow posed a risk for disclosing this type of
information in the future – particularly where she was never in a position with the
Corps of Engineers to access any sort of meaningfully confidential information

and, further, where the only harm that the Agency could identify, if such

information was disclosed, was embarrassment to the Agency.

A warning and/or continued restricted access was all that was necessary to

promote the Agency's interests in efficient service.

As Ms. Hearn explained during her hearing:

> What I did was stupid, it was more personal. I never intended to hurt
> anybody. Basically the only person I ended up hurting was me, maybe my
> coworkers or my family members because I had to admit it to them. It was
> never about defrauding the government . . . I would never intentionally do
> anything to hurt my coworkers, my agency or the government . . . I became
> so angry and distraught I made a stupid move, a stupid move that I paid
> dearly for. I have since then, I went to counseling, I got that Certificate of
> Relief of Disabilities, I finished my degree, I tried to make amends for what
> I've done, basically. After what I've been through, there is no way I would
> ever attempt to do something like that again. No way. I wouldn't wish it
> upon my worst enemy.

> [HCD 6:01:38.]

In terminating Ms. Hearn, despite her successful work performance even

while being restricted in her computer access, the Corps of Engineers abused its

discretion and exceeded its authority. Its decision, especially in light of the

numerous procedural errors, must be vacated.

## SUMMARY OF ARGUMENT

The Agency's removal of Ms. Hearn was procedurally defective and orchestrated under the erroneous presumption that Ms. Hearn was a probationary appointee who could be summarily removed from employment with the most cursory of procedures and for the most superficial of reasons. There is no dispute, however, that Ms. Hearn was an employee entitled to greater procedural protections and a more meaningful analysis as to whether her removal advanced the agency's efficiency of service.

It is Appellant's position that the Agency's procedural defects compromised Ms. Hearn's ability to create both an adequate defense to the charges against her, as well as an appropriate record on appeal.

It is Appellant's further position that the Agency's interest in efficiency of service is not advanced by her removal where she is a long-term career employee with a history of competent and dedicated service and where the facts and circumstances surrounding her previous poor judgment were discreet in nature; unlikely to ever be repeated; caused Ms Hearn much remorse and shame, so much as to guarantee no repeated acts in the future; and were personally motivated, thereby giving confidence to the Corps of Engineers that no improper disclosures would be made.

# ARGUMENT.

## *Standard of Review*

**5 U.S.C. 7703(c)** provides that:

In any case filed in the United States Court of Appeals for the Federal Circuit, the court shall review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be--

**(1)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(2)** obtained without procedures required by law, rule, or regulation having been followed; or

**(3)** unsupported by substantial evidence.

Here, Ms. Hearn respectfully submits that the Corps of Engineers' adverse

action against her was "obtained without procedures required by law, rule, or

regulation having been followed," and, in any event, was arbitrary, capricious, an

abuse of discretion, and otherwise not supported by substantial evidence.

**POINT I:   THE AGENCY IS PREVENTED FROM TAKING A SUITABILITY  ACTION AGAINST MS. HEARN INASMUCH AS 5 CFR 731.105 PRECLUDES AN AGENCY FROM TAKING A SUITABILITY ACTION AGAINST AN EMPLOYEE**

There is no dispute that the agency erroneously believed that Ms. Hearn was

a probationary employee at the time that it proposed her removal from service on

January 5, 2012. Indeed, in the January 5th proposed removal notice, the agency cites 5 CFR 315.805 as its authority for taking the action. 5 CFR 315.805 governs the termination of probationers for conditions arising before employment. Of course, employees cannot be *summarily* terminated for conduct arising before employment.

There is no dispute that the agency was incorrect in believing Ms. Hearn to be a probationer. Indeed, the agency subsequently admitted this mistake and conceded that Ms. Hearn was a reinstated career employee at the time of its decision. [HCD 3:39:55; A-70.] Further, because the Agency did not believe Ms. Hearn to be an employee, it did not follow or cite 5 U.S.C. 75 in its proposed removal notice.

When Ms. Hearn commenced her appeal before the MSPB, she characterized it as an adverse action claim. However, the Administrative Law Judge, after the hearing was conducted and simultaneous to the issuing of the initial decision in July 2012, unilaterally reclassified the matter as a suitability action, rather than an adverse action.

The ALJ's action in reclassifying this matter cannot be reconciled with the decision to uphold Ms. Hearn's removal, for the very simple fact that 5 CFR 731.105 very clearly provides that an agency may not take a suitability action against an *employee*.

Specifically, 5 CFR 731.105(e) provides:

> An agency may not take a suitability action against an *employee*. Nothing in this part precludes an agency from taking an adverse action against an employee under the procedures and standards of part 752 of this chapter or terminating a probationary employee under the procedures of part 315 or part 359 of this chapter. An agency must notify OPM to the extent required in § 731.103(g) if it wants to take, or has taken, action under these authorities.

There can be no dispute that the Agency failed to commence an adverse action proceeding against Ms. Hearn. It sought to remove her on suitability grounds only. Major Lewton's testimony at the hearing confirms this inasmuch as he focuses on Ms. Hearn simply "not being a good fit," aka suitable, for his Agency. [HCD 4:38:40.] Even the ALJ remarked on this during her own examination of Major Lewton, "I'm just concerned about the fact that you went into great detail discussing the suitability factors but not really a lot of discussion about the Douglas Factors and that's why I'm asking that." [HCD 5:20:20.]

The ALJ then went on to address her other concern that Ms. Hearn was not put on notice of her right to be heard orally on the charges, nor was she allowed to be heard. [HCD 5:20:40.] Major Lewton conceded that he did not know she was entitled to such an opportunity. [HCD 5:21:33.]

As a result of the defective procedures by which the agency removed her, Ms. Hearn's removal cannot be considered effective. To be clear, it is Ms. Hearn's position that her removal could only have been processed under 5 CFR 752.402 *et*

*seq.* Since her removal was erroneously processed under 5 CFR 315.805 and 5 CFR 731.105, the actions taken against her are null and void and must be vacated in their entirety.

5 U.S.C. 7513 sets forth the procedure to which an employee is entitled after a proposed adverse action against her. The process requires that an agency may only take an action against an employee "for such cause as will promote the efficiency of service." Further, the agency must provide the employee with thirty days' advance notice of the proposed action and a reasonable time to answer both orally and in writing, among other things.

Here, Ms. Hearn was never provided with notice as to how her removal promoted the Agency's efficiency of service. Nor was she provided with the opportunity to respond to the proposed action orally. Moreover, beyond her advance notice being devoid of any reference as to how the adverse action would promote the efficiency of service, it also failed to mention, much less explain, the application of the Douglas factors, as well as any description of her appeal rights.

These procedural deficits were never rectified. To be clear, Ms. Hearn was never given the opportunity to address, either in writing or orally, the Agency's belated argument that the Douglas Factors were considered or that her termination was "to promote the efficiency of the service." [A-152.] Moreover, the Agency failed to even explain how Ms. Hearn's termination promoted the efficiency of

service, instead just generically stating that it did. Id. The Agency never once claimed, prior to the MSPB appeal, that it had actually performed a Douglas Factor analysis, nor was a written analysis ever produced. This all makes perfect sense, of course, because the Agency mistakenly believed that Ms. Hearn was a probationer, not entitled to the same protections that an employee would be entitled to.

This Court recently advised, in Young v. HUD, 706 F.3d 1372 (2013) that, "[w]here an employee has notice only of certain charges or portions of the evidence and the deciding official considers new and material information, procedural due process guarantees are not met because the employee is no longer on notice of the reasons for dismissal and/or the evidence relied upon by the agency." Young, 706 F.3d at 1376. This Court, in Young, found that harmful procedural error had been committed which required reversal.

The same result must be had here.

Ms. Hearn never had notice of the Douglas Factors. She never had notice that her termination was to promote efficiency of service. She never had an opportunity to explain anything in person. To be certain, Ms. Hearn's response to the January 5th removal notice would have been prepared differently had the removal notice properly addressed those issues that it would come to rely on, by sheer opportunity, at the hearing. As it would stand, the Agency blindsided Ms. Hearn with after-the-fact arguments, which she never got to properly address –

either in writing or in person – prior to being terminated or prior to initiating her
appeal on same.

To reiterate, the Agency raised for the first time in its final determination
letter the following:

Arguments regarding its interests in protecting "information assurance";

An acknowledgment that Appellant was not probationary;

The alleged risks associated with Ms. Hearn's continued employment;

An alleged Risk Assessment regarding Ms. Hearn's continued employment;

The assertion that the unauthorized release of information could be
detrimental; and

The argument regarding FOUO information.

[A-70.]

Further yet, the Agency continued to buttress its determination by including
information in the Agency file, which had never been referenced in either its
proposal *or* decision letters, including hundreds of pages of various army
regulations. [A-163-534.]

In summary, Ms. Hearn was improperly treated as a probationary employee,
who no one bothered to interview or question about the situation that was
investigated for over two months' time; who was given certain limited reasons for
her proposed removal, which were then elaborated upon after she was given an
opportunity to respond in writing; who was never given the opportunity to respond

orally; and who was recommended for removal despite the fact that none of the decision makers possessed all of the relevant facts and evidence regarding the situation in concern.

Moreover, it was not until the administrative appeal stage that the Agency decided to claim that it had allegedly undertaken a Douglas Factors analysis, thereby depriving Ms. Hearn of the ability to comment on or secure evidence to rebut same.

**POINT II:  EVEN IF THIS COUT HOLDS THAT THE ACTION IS PROPERLY A SUITABILITY ACTION THE AGENCY FAILED TO CONSIDER ALL AVAILABLE INFORMATION BEFORE MAKING ITS DETERMINATION**

5 CFR 731.103(e) provides that the Agency has to ensure that the records relied upon in making the determination are accurate, relevant, timely, and complete in order to "ensure fairness to the person" subject to the determination. Further, the section goes on to require that all available information be considered in reaching a final decision on a suitability action. It is particularly obvious that the decision makers did not possess all available information in light of the blatant failures to ever once to seek clarification or information from Ms. Hearn, herself.

Here, the record is clear that the deciding officials consistently only considered and relied upon two reports in making the decision to both recommend and then confirm Ms. Hearn's removal. [A-45, 70.]

For instance, Andrew Bolya, Chief of Information Technology, testified that he did not even know what type of work Ms. Hearn was performing at the Corps of Engineers when he recommended her removal, that he did not consider any reports, or have any evidence before him – much less all available information. [HCD 2:39:10.] That anyone would recommend removal of a career federal employee without understanding the prior conduct or situation and how that relates, if at all, to her current position or work is absolutely preposterous. While Mr. Bolya was not the final decision maker, it is clear that Major Lewton relied upon his recommendation. This evidence is also illustrative of the summary and cursory procedures used by the Agency in recommending Ms. Hearn's removal, presumably because she was mistakenly thought to be probationary.

Moreover, these summary determinations fly in the face of the required analysis of the suitability factors which are enumerated under 5 CFR 731.202(b) and (c). These factors include:

> (b) *Specific factors.* In determining whether a person is suitable for Federal employment, only the following factors will be considered a basis for finding a person unsuitable and taking a suitability action:
>
> (1) Misconduct or negligence in employment;

28

(2) Criminal or dishonest conduct;

(3) Material, intentional false statement, or deception or fraud in examination or appointment;

(4) Refusal to furnish testimony as required by § 5.4 of this chapter;

(5) Alcohol abuse, without evidence of substantial rehabilitation, of a nature and duration that suggests that the applicant or appointee would be prevented from performing the duties of the position in question, or would constitute a direct threat to the property or safety of the applicant or appointee or others;

(6) Illegal use of narcotics, drugs, or other controlled substances without evidence of substantial rehabilitation;

(7) Knowing and willful engagement in acts or activities designed to overthrow the U.S. Government by force; and

(8) Any statutory or regulatory bar which prevents the lawful employment of the person involved in the position in question.

(c) *Additional considerations.* OPM and agencies must consider any of the following additional considerations to the extent OPM or the relevant agency, in its sole discretion, deems any of them pertinent to the individual case:

(1) The nature of the position for which the person is applying or in which the person is employed;

(2) The nature and seriousness of the conduct;

(3) The circumstances surrounding the conduct;

(4) The recency of the conduct;

(5) The age of the person involved at the time of the conduct;

(6) Contributing societal conditions; and

(7) The absence or presence of rehabilitation or efforts toward rehabilitation.

Indeed, it is clear from the record that no one involved in the decision making process ever meaningfully considered the nature of Ms. Hearn's current position as a low-level, low-security Program Analyst, the contributing societal conditions that gave rise to her prior conduct, the fact that the conduct was committed four years earlier, and the evidence of Ms. Hearn's remorse and rehabilitation. Major Lewton specifically testified that he did not consider Ms. Hearn's potential for rehabilitation because he did not find it to be "applicable." [HCD 4:59:48.]

Major Lewton simply found Ms. Hearn to not be a good fit, but that is not enough to remove her, whether the analysis is one of suitability or adverse action. [HCD 4:38:40.]

**POINT III: EVEN IF THIS COURT DETERMINES THAT THE PROCEDURAL ERRORS WERE SOMEHOW HARMLESS, SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE DETERMINATION THAT THERE IS A NEXUS BETWEEN MS. HEARN'S PAST MISCONDUCT AND THE EFFICIENCY OF SERVICE OF THE CORPS OF ENGINEERS**

An agency may remove an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a) (2000); Dep't of the Navy v. Egan, 484 U.S. 518, 522, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). An employee's

discharge is to be sustained by the board if "supported by a preponderance of the evidence." 5 U.S.C. § 7701(c)(1)(B) (2000). "[A]n agency must establish three things to withstand challenge to an adverse action against an employee." Pope v. United States Postal Serv., 114 F.3d 1144, 1147 (Fed.Cir.1997). First, it must prove by a preponderance of the evidence that the charged misconduct occurred and then it must show a relationship between the misconduct and the objective of promoting the efficiency of the service. Id. The latter requires the agency to establish a nexus between the misconduct and the efficiency of the service. Brown v. Dep't of Navy, 229 F.3d 1356, 1358 (Fed.Cir.2000); Hayes v. Dep't of Navy, 727 F.2d 1535, 1539 (Fed. Cir. 1984). Lastly, after a nexus is shown, the agency may exercise its discretion and impose a reasonable penalty for the misconduct. Lachance v. Devall, 178 F.3d 1246, 1251 (Fed.Cir.1999).

An adverse action promotes the efficiency of service only when "the employee's misconduct is likely to have an adverse impact on the agency's performance of its functions." Brown, 229 F.3d at 1358.

The Merit Systems Protection Board has analyzed the issue of when off-duty misconduct may justify the removal of a non-probationary competitive service employee. See Merritt v. Department of Justice, Docket No. PH075209058 (MSPB 1981).

The District Court, in <u>Grebosz v. United States Civil Service Commission</u>,
472 F.Supp. 1081, 1087 (S.D.N.Y. 1979), reversed the Postal Service's decision to
terminate an employee after his conviction for the sale of cocaine, holding that no
nexus had been established between the conviction and the efficiency of the postal
service. The Court explained:

> Especially favorable to him are its findings that he had not been in trouble
> with the law or on the job before or after the conduct in question and that he
> was rehabilitated . . . that he was at worst a good employee . . . and that his
> conduct did not directly involve or affect his job performance . . . The
> decision reflects that the record is utterly devoid of evidence linking the
> conduct with the efficiency of the agency. The evidence that he was at all
> times, which includes nearly three years after the conduct, a good employee
> is overwhelming. The Postal Service was either unwilling or unable to
> counter this evidence other than by relying on the convictions, their
> seriousness, and the agency's public duty.

<u>Id</u>.

Here, Ms. Hearn's prior misconduct of eavesdropping on her colleagues'
phone calls, solely in an attempt to ascertain whether she would be disciplined or
terminated for having reported the improper claim of overtime by those colleagues
is such isolated and personal conduct, which caused no harm to the agency, the
public, or her colleagues, and, as a result, could have no bearing whatsoever on the
efficiency of service of the Corps of Engineers. This is especially true where Ms.
Hearn did not disclose any information learned by her, nor did she seek to
undermine or compromise her employer's position or mission. Like Grebosz
(above), Ms. Hearn was "at worst a good employee," and "the evidence that [s]he

32

was at all times, which includes nearly [four] years after the conduct, a good

employee is overwhelming." In addition, Ms. Hearn had years of excellent and

exceptional service prior to the incident. She was consistently rated as Outstanding

in her performance evaluations. [A-557-558.]

**POINT IV: THE PENALTY OF TERMINATION IS AN ABUSE OF
DISCRETION AND ARBITRARY AND CAPRICIOUS
INASMUCH AS THERE IS NO RATIONAL
CONNECTION BETWEEN THE GROUNDS CHARGED
AND THE INTEREST ALLEGEDLY SERVED BY THE
SANCTION**

The Merit Systems Protection Board has cautioned that:

Any disciplinary action demands the exercise of responsible judgment so
that an employee will not be penalized out of proportion to the character of
the offense; this is particularly true of an employee who has a previous
record of completely satisfactory service. An adverse action, such as
suspension, should be ordered only after a responsible determination that a
less severe penalty, such as admonition or reprimand, is inadequate.

Douglas v. Veterans Administration, AT075299006 (MSPB 1981), *citing*

OPM's Federal Personnel Manual, ch. 751, subch. 1-2b, 1-2(c)(2).

In this case, and especially since the conduct occurred four years prior to

Ms. Hearn's employment with the Corps of Engineers (and arose out of a one-time,

unique situation which would be unlikely to ever be recreated), if there truly was

any sincere fear that Ms. Hearn would *repeat* her prior actions – which is neither

logical, nor supported by the evidence in the record – the agency could have

merely informed Ms. Hearn that it was aware of her prior misconduct, while simultaneously warning her that any such future actions would not be tolerated and would be subject to immediate discipline, including termination. There can be no dispute that Ms. Hearn learned a lesson in previously exercising her error in judgment and suffering the consequences of same.

It is abundantly clear that Ms. Hearn's misconduct was an isolated event, which occurred under isolated circumstances, and from which she learned critical lessons. Indeed, Ms. Hearn would not repeat such conduct. And, to be clear, Ms. Hearn did not repeat such conduct at any time subsequent. In fact, her employment record, both before and after the isolated event, is stellar.

Efficiency of service would be better served by the retention of a qualified, skilled, long-term, career employee who has already completed the interview and hiring processes and who is already serving, without complaint or discipline, in her position. It surely is contrary to the notion of efficient service to needlessly and summarily dispose of individuals who are successfully and satisfactorily performing their work and require the agency to both operate without that employee *and* to engage, once again, in the interviewing and hiring processes to fill the vacancy left behind. This is particularly so where the conduct at issue is isolated, unlikely to be repeated, and was committed four years prior.

**POINT V: THE AGENCY NEVER CONSIDERED THE DOUGLAS
FACTORS AND THE BOARD FAILED TO CONSIDER
ALL OF THE RELEVANT DOUGLAS FACTORS**

The record is clear that the Agency did not address the Douglas Factors until

it submitted its pre-hearing submission, dated May 15, 2012, *after* Ms. Hearn

submitted her pre-hearing submissions, dated May 11, 2012, where she included

the Army Adverse Action Checklist and Guidance for Deciding Officials, which

references same. [A-1081, 1084.] It, of course, remains the Appellant's position

that her due process rights were violated by the Agency's belated arguments

regarding the Douglas Factors. And, while it has been held that an Administrative

Law Judge can conduct his or her own analysis in lieu of the Agency's faulty or

deficient analysis, the distinction between those cases and the one at hand is that

here Ms. Hearn was never put on notice that the Agency was applying the Douglas

Factors.

Regardless, however, of whether the Agency is believed to have conducted a

Douglas Factor analysis prior to Ms. Hearn's removal, there is no dispute that the

agency decision-maker, Lewton, failed to prepare a *written* analysis of the Douglas

Factors. Though, at the hearing he testified that he considered *belatedly* a few of

the factors, though it is not overly clear what his analysis actually was.

The Board, through the administrative law judge, attempted to correct

35

Lewton's deficiency by discussing, generally, the factors herself, however, the ALJ only actually considered *two* of the factors (#1 and #12) and failed to address the numerous others which are relevant to the determination of whether the proposed penalty is reasonable.

The failure to consider all of the relevant factors renders both the Agency's and the Board's decisions defective, especially as it regards the Agency's burden of acting reasonably in choosing a remedy.

The Douglas factors, each of which will be addressed in turn, are as follows:

1.  The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2.  the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3.  the employee's past disciplinary record;

4.  the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5.  the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's work ability to perform assigned duties;

6.  consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7.  consistency of the penalty with any applicable agency table of penalties;

8. the notoriety of the offense or its impact upon the reputation of the agency;

9. the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. the potential for the employee's rehabilitation;

11. mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

12. the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

While not all of the factors are necessarily relevant in every case, the fact of the matter is that the Board failed to consider all of the factors relevant in *this* case, as is elaborated upon below:

1. **THE NATURE AND SERIOUSNESS OF THE OFFENSE, AND ITS RELATION TO THE EMPLOYEE'S DUTIES, POSITION, AND RESPONSIBILITIES, INCLUDING WHETHER THE OFFENSE WAS INTENTIONAL OR TECHNICAL OR INADVERTENT, OR WAS COMMITTED MALICIOUSLY OR FOR GAIN, OR WAS FREQUENTLY REPEATED**

Ms. Hearn pleaded guilty to a violation of 18 U.S.C. 1030(a)(2)(B), for exceeding authorized access on a computer, on December 30, 2008 in federal court for the Western District of New York. This was a reduced charge and was not a reflection of the actions that she had actually undertaken in monitoring her supervisor's telephone conversations. To be clear, Ms. Hearn never compromised a

37

computer network or system, nor did she ever improperly access computer information. It is clear from Major Lewton's testimony that he never understood what Ms. Hearn had actually done. [HCD 4:38:45.]

In any event, her sentence required for her only to pay a fine. She was not sentenced to jail, nor was she placed on probation. There can be no dispute that the Court, in light of the unique facts regarding the situation, exercised great leniency in imposing the sentence. There also can be no dispute that Ms. Hearn was remorseful and embarrassed by her conduct. An out of control hostile work environment employment situation that had been in play for years culminated in Ms. Hearn letting go of her better judgment. She suffered the many consequences of that decision. But, it was isolated and it was discreet. Moreover, the circumstances that led to her decision are unique and extraordinary and were long left behind at the Department of Homeland Security.

It is critical that the record evidence clearly establishes that Ms. Hearn did not divulge any confidential or sensitive information as a result of her actions. It is even more critical that Ms. Hearn did not engage in the actions that she did for any improper purpose, other than attempting to determine whether she was going to be disciplined or otherwise lose her job over blowing the whistle on the overtime issues. Ms. Hearn did not improperly secure or misappropriate confidential information for any personal financial gain, or to commit fraud, or theft, or any

other immoral and unethical act. Instead, Ms. Hearn, out of what was, for all

intents and purposes, an extraordinary opportunity combined with sheer

desperation and an unsolicited third party offer to allow her to eavesdrop, made a

decision to listen in on telephone conversations. And, while such actions were

unlawful, they do not come without explanation, and such actions are not

inherently malicious or shocking to the conscience. Nor is Ms. Hearn inherently

mischievous or malicious. She is a hardworking, stable, professional, and

competent woman who made a mistake after years of working in a dysfunctional

and bullying work environment. Indeed, it bears repeating that the maltreatment

Ms. Hearn was subjected to by her peers and her supervisor was due to her belief

that her colleagues were improperly putting in for overtime hours and pay, *i.e.,*

stealing from their government employer. Ms. Hearn, simply by way of her protest

regarding the improper overtime claims, has amply demonstrated her character and

intentions with respect to both performing her work with integrity and ensuring the

efficiency of service.

   Further, the MSPB, itself, has advised that "in the absence of any readily

apparent adverse impact on the Agency, we conclude that the seriousness of the

offense must be discounted." Douglas, AT075299006 at pp. 340-341.

   Here, of course, no adverse impact was had on Ms. Hearn's former

employer. Nor was she terminated from that position, even where she held a much

higher Public Trust position.

The Agency abused its discretion in giving excessive weight to its faulty interpretation of Douglas Factor #1 inasmuch as this factor is favorable to Ms. Hearn.

**2.  THE EMPLOYEE'S JOB LEVEL AND TYPE OF EMPLOYMENT, INCLUDING SUPERVISORY OR FIDUCIARY ROLE, CONTACTS WITH THE PUBLIC, AND PROMINENCE OF THE POSITION**

As has been well established, Ms. Hearn's misconduct occurred in late 2007 when she was employed with the Department of Homeland Security. Her conduct involved telephone eavesdropping which was done for personal and unique reasons and which would never have occasion to be repeated, especially in her then-current employment with the Corps of Engineers.

The Program Analyst position is a non-sensitive position and the duties consist mainly of data entry and analysis. [HCD 1:21:52.] Ms. Hearn possessed no security clearance and she was not exposed to any classified information. [HCD 1:33:14.] She was not a supervisor, she had no contact with the public, and she did not hold any sort of prominent role.

Critically, once discovering Ms. Hearn's past conduct, the Corps of Engineers restricted her computer access, unbeknownst to her, while she continued to effectively, efficiently, and successful perform her work during the course of

their alleged investigation. While it is our position that Ms. Hearn was unable to access any sensitive information and, thus, restrictions were not necessary, the fact is that the Corps of Engineers' assertion that Ms. Hearn could not continue to perform her work is restricted access is absolutely erroneous because *it was happening for more than two months' time*. Moreover, she performed five months' of work, at all times, while acting competently and lawfully.

This factor falls in Ms. Hearn's favor.

### 3. THE EMPLOYEE'S PAST DISCIPLINARY RECORD

Ms. Hearn's employment record is clean. Prior to the issues surrounding the misconduct in 2007, she had never been disciplined. Subsequent to the issues surrounding the misconduct in 2007, she has not been disciplined. During the course of her service with the Corps of Engineers, her performance was competent and incident free; as is set forth above, she was consistently rated Outstanding in all areas of her prior performance evaluations. Of course, these facts only serve to corroborate the argument that Ms. Hearn's misconduct was a one-time, isolated incident not subject to repeat offense.

This factor falls in Ms. Hearn's favor.

4. **THE EMPLOYEE'S PAST WORK RECORD, INCLUDING LENGTH OF SERVICE, PERFORMANCE ON THE JOB, ABILITY TO GET ALONG WITH FELLOW WORKERS, AND DEPENDABILITY**

In line with the above, Ms. Hearn's prior work record, both before her misconduct in 2007 and then until her termination from the Corps of Engineers in 2012, was untarnished. She was and remained a long-time (over 22 years), competent employee, who was dedicated to her service and dependable in all respects. To be clear, Ms. Hearn had absolutely no conflicts or other controversies arise during the course of her employment with the Corps of Engineers.

This factor falls in Ms. Hearn's favor.

5. **THE EFFECT OF THE OFFENSE UPON THE EMPLOYEE'S ABILITY TO PERFORM AT A SATISFACTORY LEVEL AND ITS EFFECT UPON SUPERVISORS' CONFIDENCE IN THE EMPLOYEE'S WORK ABILITY TO PERFORM ASSIGNED DUTIES**

Because Ms. Hearn's offense was committed outside of (and years before) her employment with the Corps of Engineers, it is Appellant's position that the offense has absolutely no bearing on her ability to perform at a satisfactory level and, in fact, she was performing at a satisfactory level until she was terminated from service.

Ms. Hearn's prior monitoring of her colleagues' phone calls in order to determine if she would be fired over a whistleblower incident, while foolish and wholly inappropriate, was not an attempt by her to misappropriate sensitive or

classified information for illegitimate means. There is no rational basis to believe that Ms. Hearn's prior acts – wherein it is undisputed that she did <u>not</u> release or disclose any sensitive or classified information – would cause her to suddenly misappropriate and disclose sensitive or confidential information to the public now. Ms. Hearn was not previously motivated by a desire to hurt her employer, or some other devious plot which would jeopardize the government or the public. She was merely concerned about being terminated from her job and after a once in a lifetime opportunity was given to her, she exercised poor judgment and seized it. No harm came to the agency. No harm came to her colleagues. It isn't as though Ms. Hearn was involved in some conspiracy to plot against her employer, our government, or the public. Her reasons were purely personal and, again, while it is not a justification, it puts her actions into context and requires the decisionmaker to reflect on whether those actions are likely to be repeated and, if they were, if they would expose the Corps of Engineers to any actual risk. The only rational answer is no. Ms. Hearn's position with the Corps of Engineers was a non-sensitive position. Thus, she had no access to any classified material or information.

This factor falls in Ms. Hearn's favor.

### 6. CONSISTENCY OF THE PENALTY WITH THOSE IMPOSED UPON OTHER EMPLOYEES FOR THE SAME OR SIMILAR OFFENSES

It is Ms. Hearn's position that other employees who committed similar

misconduct were merely disciplined instead of being terminated and had she been properly put on notice that the Agency was applying the Douglas Factors, she would have sought discovery on this particular issue. It is asserted that this factor would have swayed in Ms. Hearn's favor.

Moreover, the record makes clear that Major Lewton had no prior experience disciplining civilian employees. [HCD 5:15:30.] His background and experience lay in military personnel. Of course, Ms. Hearn, as a low level civilian employee working for a civilian agency was not subject to the same level of critique and standards that military personnel would properly be subjected to. Thus, it is Ms. Hearn's position that she was unfairly treated, despite her civilian status, in the same way that Major Lewton would have handled a military issue.

## 8. THE NOTORIETY OF THE OFFENSE OR ITS IMPACT UPON THE REPUTATION OF THE AGENCY

There can be no dispute that Ms. Hearn's offense was not notorious. Indeed, if we were to believe Ms. Czombel's testimony (as the MSPB chose to), despite being Ms. Hearn's friend, confidante, and reference for both Ms. Hearn's employment paperwork as well as the investigation on her request for the Certificate of Relief from Disabilities, Ms. Czombel, herself, did not even know of Ms. Hearn's guilty plea and conviction in federal court. To be clear, Ms. Czombel vigorously denied knowing or remembering about Ms. Hearn's conviction or her

own participation in Ms. Hearn securing the Certificate of Relief from Disabilities.

[HCD 3:33:20, 3:33:28, 3:33:45, 3:36:20, 3:36:55, 3:37:28, 3:37:40, 3:37:46,

3:51:12, 3:51:433:53:10, 3:53:20.]

The record is further devoid of press or media attention. And, certainly, the

Agency was unaware, beyond Ms. Hearn's disclosure in the written application

process, of the circumstances. As a result, there could be no concern that Ms.

Hearn's prior actions, taken four year prior and during her employment with a

separate agency, could impact upon the reputation of the Corps of Engineers.

This, too, is a relevant factor that sways in Ms. Hearn's favor.

**10.    THE POTENTIAL FOR THE EMPLOYEE'S REHABILITATION**

The potential for rehabilitation in this case was not only excellent, but was

all but guaranteed. Ms. Hearn completed counseling [A-760], a lengthy and

intensive investigation and interview process in order to secure her Certificate of

Relief from Disabilities, and through all of it, she learned her lesson. Moreover, the

unlikelihood of the situation ever repeating itself only serves to corroborate the fact

that Ms. Hearn was fully rehabilitated with the intentions of living a law abiding

life.

This factor, too, falls in Ms. Hearn's favor.

**11. MITIGATING CIRCUMSTANCES SURROUNDING THE OFFENSE SUCH AS UNUSUAL JOB TENSIONS, PERSONALITY PROBLEMS, MENTAL IMPAIRMENT, HARASSMENT, OR BAD FAITH, MALICE OR PROVOCATION ON THE PART OF OTHERS INVOLVED IN THE MATTER**

As is explained above, Ms. Hearn was embroiled in a hostile work environment where she was ostracized by bitter coworkers and retaliated against by her supervisor who had made promises of overtime, which he could not deliver on. Such a situation clearly constitutes "unusual job tensions," "personality problems," and "harassment." Further, as is also explained above, Ms. Hearn only was able to monitor the telephone conversations of her supervisors because she received a unilateral offer by a colleague to configure the telephones. Ms. Hearn did not independently determine to engage in such activity, nor did she have the capacity to do it herself. It was a bizarre opportunity, which certainly could be considered "provocation on the part of others involved in the matter." Indeed, the person who offered to set up the system for Ms. Hearn was also charged criminally.

Ms. Hearn's version of events in Batavia is corroborated in the record. Specifically, Ms. Hearn's colleague and coworker, Beverly Neale, gave a statement regarding same, which appears at pages 755-757 of the Appendix.

Ms. Neale explained:

> The subject [Ms. Hearn] and her supervisor, Mary Barrett, are what the source refers to as "oil and water," as the best way to describe their relationship. [Ms. Hearn] was very knowledgeable about her job, and very

46

capable. Barrett did not know the job as well. [Ms. Hearn] also would not do things outside of regulations, even if she was ordered to. [Ms. Hearn] did not blindly follow orders, and would question her supervisors, when she felt it was necessary. [Ms. Hearn] has very high integrity and will not do wrong even if she is told to.

In the Fall 2006, there was a company Kids' Day. In reviewing paperwork from it, [Ms. Hearn] saw that employees were receiving overtime pay from it, when it was supposed to be volunteered time. [Ms. Hearn] red flagged it and took the matter to the field officer, Bill Cleary. Cleary told [Ms. Hearn] to let it go. [Ms. Hearn] was not comfortable doing that, so she took the matter to Chuck Mule, the Facilities Director. Mule told the subject to process it anyway. Since [Ms. Hearn] knew it was wrong, she took the matter to OIG, which is the Internal Affairs Group . . . OIG instructed [Ms. Hearn] not to let it go and to open up a full investigation . . . after this incident, [Ms. Hearn] became what [Ms. Neale] refers to as "blacklisted" by the supervisors.

[A-756.]

Ms. Neale went on to discuss the subsequent issues which Ms. Hearn had

with her supervisors and which immediately preceded her ill-informed decision to

monitor their conversations about her. The fact of the matter is that Ms. Hearn's

supervisors were playing fast and loose with the rules, of which Ms. Hearn wanted

no part. Unfortunately, Ms. Hearn's unwillingness to either participate or look the

other way was detrimental to her.

## 12. THE ADEQUACY AND EFFECTIVENESS OF ALTERNATIVE SANCTIONS TO DETER SUCH CONDUCT IN THE FUTURE BY THE EMPLOYEE OR OTHERS

The Agency spends much time arguing that nothing else short of termination

could be done to address the risks and concerns associated with keeping Ms. Hearn

employed. But its argument simply does not reconcile with the facts that Ms. Hearn was employed for five months' time, wherein she performed her work successfully and without incident; she was allowed full computer access for two months of that time and she did not commit any security breaches or other improper activities; and she was restricted in access for two months' of that time which never even impeded her ability to perform her work.

There was no emergent need or reason to remove Ms. Hearn from service. Indeed, she was not removed even after the Agency began investigating her conviction. Because Ms. Hearn was fully rehabilitated and because the past conduct was born out of peculiar and particular circumstances not present at the Corps of Engineers, restricting her access and/or simply warning her about such activity would have served as adequate and effective solutions to deter any further conduct.

Indeed, Major Lewton testified that there was no emergent need to remove her because *there was no risk associated with her continued employment at that time*. [HCD 4:40:38, 4:49:50.] In fact, Ms. Hearn was allowed to continue working for weeks afterward. [HCD 4:44:50.] This, of course, continues to corroborate Ms. Hearn's position that her termination could not have promoted efficiency of service, but was merely premised upon Major Lewton's military-influenced and

48

uninformed opinion that Ms. Hearn was "not a good fit." [HCD 3:02:16, 4:38:40, 4:40:38.]

### POINT VI: MS. HEARN'S APPEAL WAS TIMELY FILED INASMUCH AS IT WAS TIMELY FILED WITHIN SIXTY DAYS OF HER RECEIPT OF THE DECISION

Ms. Hearn received the Decision, dated April 26, 2013, on or about May 3, 2013. [There is no dispute that the Decision was mailed to her on April 26, 2013 and, at the earliest, would not have been received until the following day, April 27th.] *See* Docket Nos. 1 and 23-7.

Thereafter, Ms. Hearn's appeal was sent out for filing on June 18, 2013, a full week before it was due. *See* Docket No. 1-3. Due to the delay in the Court's mail procedures, the appeal was not received by the Clerk until June 26th, sixty one days after the Decision was dated. However, the Clerk accepted the appeal as timely inasmuch as Ms. Hearn had indicated her receipt of the appeal to be May 3, 2013, thus, her sixty days to appeal ran from that date for purposes of the Clerk's determination as to timeliness. It is Ms. Hearn's understanding that the Clerk will not generally accept appeals which are untimely on their face, but will return them to the sender.

The Fifth Circuit Court of Appeals, as cited by the DOJ, in its 2005 decision in Oja v. Dept. of Army, 405 F.3d 1349 (Fed. Cir. 2005), has advised that "the 30-

day time period for review is measured from the earlier date of receipt by the party

or counsel of the Board's final decision, and that the time specified by statute is

'statutory, mandatory, [and] jurisdictional . . ." Id. at 1357, *citing* Monzo v. Dept.

of Transportation, 735 F.2d 1335, 1336 (Fed. Cir. 1984).

Monzo was a 1984 decision, rendered twenty years before the time of

electronic notice and the CFR's provisions regarding electronic notice and e-filing

with the MSPB, particularly as it relates to a party's ability to have a separate and

distinct service of process status from her representative. Moreover, it is

Appellant's view that Oja mischaracterized the holding in Monzo, inasmuch as this

Court instructed not that it was whomever received the decision *earlier* but that it

was when a party's receipt of the decision *actually* occurred, the time to appeal ran

from the party's receipt.

This Court wrote:

> The MSPB order denying petitioner's request for review was received
> by him on October 11, 1983, and by his attorney on October 14, 1983.
> The petition for review by this Court was received by the Clerk on
> November 14, 1983. Under the statute, the date of receipt by
> petitioner's counsel is irrelevant where petitioner himself actually
> received notice. Receipt of notice by petitioner on October 11
> triggered the statute of limitations and his appeal is late on its face.

Monzo, 735 F.2d at 1336.

Here, Ms. Hearn actually received notice of the MSPB's April 26th decision *on or after* April 27th, inasmuch as the MSPB mailed her a copy of the decision by U.S. Mail in line with her election to receive service of process non-electronically, thereby making her June 26th docketed appeal timely.

Because the Code of Federal Regulations specifically provides that a party can elect to <u>not</u> receive his or her notices and pleadings via e-filing, even if his or her representative so elects to receive such notices, an appellant ought only to be bound to file her petition for review within the 60-day period from the time which *she* received same, whether that time is before *or* after her representative's receipt of such notice. This result is in line with <u>Monzo</u>.

Specifically, 5 CFR 1201.14(e)(3) provides:

> When a party who is an individual is represented, the party and the representative can make separate determinations whether to register as an e-filer. For example, an appellant may file and receive pleadings and MSPB documents by non-electronic means, even though his or her representative has registered as an e-filer.

Here, because Ms. Hearn was not a registered e-filer at the time of the April 26, 2013 Decision and, further, because the certificate of service specifically acknowledges that she received the Decision via U.S. mail and, even further, because Ms. Hearn did, in fact, receive the Decision on or about May 3, 2013, her Petition for Review is timely.

Indeed, the clerk for the Federal Circuit Court of Appeals, advised Appellant's counsel that she only accepted the Petition for Review because it was filed within sixty (60) days of receipt of notice, as was indicated on the Petition itself.

The time to appeal should only commence from the appellant's receipt of the order or decision being appealed from. This holding is the only common sensical conclusion in light of Congress's permission for appellants and representatives to be *separate* and *independent* when it comes to e-filing.

Further, the fact of the matter is that an appellant may not continue to be represented by her registered e-filing representative during the course of any further legal proceedings, especially as the venue and forum changes from an administrative agency (the MSPB) to the Federal Circuit Court of Appeals. Thus, to the extent that she elects to appeal on her own, her time ought to run from *her* notice of the decision. Holding that her representative's earlier notice starts the clock on her time to appeal, even without her former representative's continued legal assistance, only serves to decrease her actual time to appeal. Certainly it was not the intent of Congress to reduce an appellant's time to appeal from 60 days from receipt of the decision to even less time, depending on when the representative received same.

**POINT VII:**      **THE PRESUMPTION THAT A REGISTERED E-FILER RECEIVES SIMULTANEOUS NOTICE OF DOCUMENTS FILED BY THE BOARD IS A REBUTTABLE PRESUMPTION**

The certificate of service here indicates that Ms. Hearn was sent the decision via regular mail. *See* Docket No. 23-7, p. 11. Ms. Hearn attests that she received the decision via regular mail and that when she did receive it, she called Mr. Fleming's office and spoke with him, at which point he stated that he had not received a notification. *See* Docket No. 23-6.

The decision and certificate of service further indicates that Mr. Fleming was served via "electronic mail" but that such notice was sent to him at his physical mailing address of Chiacchia & Fleming, LLP, 5113 South Park Avenue, Hamburg, New York 14075.

Lastly, neither the decision, nor the certificate of service that were e-filed by the MSPB on April 26th were signed. [Of course, this begs the question as to why the Ms. Hearn's and the Department of Justice's version of the Order is signed.]

We have conducted an extensive search of our e-mail server and e-mail programs in an effort to locate the April 26th notice that should have been sent to Mr. Fleming upon the MSPB's filing of the April 26th decision. To date, we have not located same. Indeed, despite numerous searches by our IT personnel, no such e-mail has been uncovered. *See* Docket Nos. 23-5 and 23-8.

Further, upon contacting the MSPB, we have been provided with a history of logins to the MSPB website and repository on Mr. Fleming's account. Such history indicates that he logged in twice on August 17, 2012, once on August 20, 2012, once on August 22, 2012, once on September 14, 2012, and twice on July 24, 2013. To be clear, neither Mr. Fleming, nor anyone else under his account, accessed the repository between April 1, 2013 and July 24, 2013, thus, corroborating our position that a notice was never received. Indeed, had a notice been received, Mr. Fleming, or his staff, would have accessed the link and corresponding document(s), saved same in the client's file, and inherently created a login history that would correspond to the MSPB's attempted issuance of the decision on April 26th.

Instead, both Mr. Fleming and Ms. Hearn recollect that Ms. Hearn informed Mr. Fleming about the decision the day that she received it in the mail *after* the April 26th decision date and that Mr. Fleming similarly received it in the mail thereafter.

The CFR acknowledges that there may be errors in the email notification processes, to wit, 5 CFR 1201.14(j)(2), (n)(1), and (o), all address situations where non-delivery occurs via electronic mail. In those cases, the CFR provides that paper copies of the document(s) will be made via regular mail. In fact, 1201.14(o) specifically requires a registered e-filer to keep his address current at all times

because the MSPB can opt, unilaterally, to serve by mail, despite the e-filing designation and despite there being no difficulties in effecting electronic service.

Because the evidence indicates that no electronic service was received by Mr. Fleming and, further, that Mr. Fleming did not log into the repository to access the decision, the presumption that he received the decision on the date it was issued ought to be rebutted and he must only be held to have received the decision *after* its date of issuance inasmuch as we assert that it was received via U.S. Mail. Here, even if Mr. Fleming received the decision in the mail the very next day, on April 27, 2013, Ms. Hearn's appeal is still timely.

The MSPB's clear intention was to allow a party to remain distinct and independent from her representative. The fact that a party's representative *voluntarily* elects to participate in the *voluntary* e-filing program should never serve to punish a party who does not similarly elect to receive electronic process. Indeed, if the MSPB desired such a result, certainly the regulations would have been drafted to either not include separate designations by a party and her representative or it would have contained a provision specifically deeming receipt by the representative to be receipt by the party (which would totally gut the whole idea behind allowing separate designations in the first instance). However, the regulations were very clearly drafted to allow separate designations and separate receipt.

Moreover, the electronic service process is not without quirks and mistakes – whether by human or machine error. Here, it is obvious that Mr. Fleming did not receive the decision at issue from the MSPB website inasmuch as his login history does not reflect such access. Further, Ms. Hearn did not send Mr. Fleming a copy of the decision inasmuch as hers is signed and Mr. Fleming's is not. Yet, Mr. Fleming possesses a hard copy of the decision. The only conclusion can be that it was mailed to him; either after electronic service was undeliverable, or simply in lieu of same.

Because Ms. Hearn's appeal was filed within sixty (60) days from April 27th, the day after the decision was issued, this action is timely and must be determined on its merits.

## CONCLUSION

Ms. Hearn was a solid employee who made a single misstep; a misstep that occurred four years before her employment with the Corps of Engineers commenced; a misstep that never caused anyone harm, except Ms. Hearn, herself.

She paid for her mistake. Ms. Hearn is a qualified, capable employee, which is why she was hired above nineteen or so other candidates for the position she was working in at the time of her removal. All of the evidence in the record speaks to her rehabilitation, competence, and generally works in Ms. Hearn's favor, including the fact that the Agency unequivocally violated her due process rights in the course of removing her from service. The ALJ sanctioned the Agency's procedural errors, applied an improper analysis, and upheld the removal of an employee under a suitability analysis, all of which was improper.

This Court properly has jurisdiction over this matter inasmuch as the Clerk of this Court received Ms. Hearn's Petition for Review for filing on June 26, 2013, less than sixty days after Ms. Hearn's May 3rd receipt of the decision.

Dated:     December 30, 2013
           Hamburg, New York

                                    /s/Christen Archer Pierrot
                                    Christen Archer Pierrot, Esq.
                                    Chiacchia & Fleming, LLP
                                    *Counsel for the Petitioner*
                                    5113 South Park Avenue
                                    Hamburg, New York 14075
                                    Tel: (716) 648-3030
                                    E-Mail: cap@cf-legal.com

**ADDENDUM**



# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### NEW YORK FIELD OFFICE

| | |
|---|---|
| PAULA JO HEARN,<br>          Appellant, | DOCKET NUMBER<br>NY-0731-12-0120-I-1 |
| v. | |
| DEPARTMENT OF THE ARMY,<br>          Agency. | DATE: July 17, 2012 |

<u>Andrew P. Fleming</u>, Esquire, Hamburg, New York, for the appellant.

<u>Bryan E. Miller</u>, Esquire, Buffalo, New York, for the agency.

**BEFORE**
Maria M. Dominguez
Administrative Judge

## INITIAL DECISION

### INTRODUCTION

On March 19, 2012, the appellant filed a timely appeal with the Merit Systems Protection Board (the Board), challenging the agency's decision to remove her for suitability reasons from the position of Program Analyst, GS-0343-09, at the agency's Corps of Engineers, Buffalo District (Buffalo District), in Buffalo, New York, effective February 24, 2012. *See* Initial Appeal File (IAF), Tabs 1; 6, Subtabs 4B; 4C. The appellant was a reinstated career employee under 5 C.F.R. §§ 315.201(c), .301(b), .302, and .401. *See id.*, Tab 6, Subtab 4S, Standard Form (SF) 50, Notification of Personnel Action. Therefore, the Board has jurisdiction over the removal action at issue here. *See* 5 U.S.C. §§ 7511(a)(1), 7512(1), 7513(d) and 7701(a). The hearing that the appellant

requested was held on May 31, 2012 via video conference in New York, New York. *See* Hearing Compact Disc (HCD).

For the reasons set forth below, the agency's removal action is AFFIRMED.

## ANALYSIS AND FINDINGS

<u>Background</u>

Certain salient facts are not in dispute.[1] Prior to her employment with the agency's Corps of Engineers, the appellant was employed as a Mission Support Specialist at the U.S. Department of Homeland Security's (DHS) Bureau of Immigration and Customs Enforcement (ICE), located at DHS's Buffalo Federal Detention Facility (BFDF), in Batavia, New York. *See* IAF, Tab 11, stipulations 1; 2.

While the appellant was employed at DHS's BFDF in October 2007, an individual who she knew, but who was not employed by the Federal government, offered to configure, and did in fact configure, some software for the appellant to enable her to covertly monitor telephone system conversations of her supervisors at the facility. *See id.*, stipulation 3; *see also* HCD. This individual was familiar with the software configuration of the telephone system utilized by DHS. *See id.*

For a period from about October 2007 through mid-January 2008, the appellant covertly monitored the telephone conversations of her superiors at DHS BFDF by listening in on said conversations as they occurred, without authorization and without knowledge, on the part of her superiors that such monitoring was occurring. *See id.*, stipulation 4. At the time of the covert monitoring, the appellant was 41 years of age and she listened in on the telephone conversations of individuals such as the head of the BFDF. *See id.*, stipulations

---

[1] At the beginning of the hearing on May 31, 2012, the parties advised me that they had reached a number of stipulations as drafted in the agency's prehearing submissions. *See* IAF, Tabs 8; 11; 13. *See also* Hearing Compact Disc (HCD).

5; 6.   Through her covert monitoring of the calls, the appellant improperly obtained information that belonged to DHS's Bureau of Immigration and Customs Enforcement.  *See* IAF, Tab 11, stipulation 7.  Through these means, she also improperly obtained information about herself and other employees at the facility, including information pertaining to another employee's gambling activity.  *See id.*, stipulation 8.

Although the appellant might have disclosed to other employees information regarding herself that she obtained through the covert monitoring, she did not disclose any law enforcement sensitive information to anyone.  *See id.*, stipulation 9; *see also* HCD.  However, she did not have authorization to monitor the telephone conversations and such monitoring was not a part of her duties.  *See id.*, stipulation 10.  Despite initially denying that she had covertly monitored telephone conversations, the appellant subsequently admitted her actions to an outside contractor.  *See id.*, stipulation 11; *see also* HCD.  As a result of the above, the appellant pled guilty to a violation of 18 U.S.C. 1030(a)(2)(B), "Fraud and Related Activity in Connection with Computers," on December 30, 2008.  *See id.*, stipulation 12; *see also id.*, Tab 6, Subtab 4N.  The appellant then left her DHS job.

The Buffalo District provides national security, environmental sustainability, water resource management, and emergency assistance to the Great Lakes Region.  *See* HCD, testimony of Major Martin E. Lewton (Maj Lewton), Deputy Commander of the Corps of Engineers, Buffalo District.  As such, the Buffalo District is involved in emergency management missions, medication missions, and Hazardous, Toxic, Radiological Waste missions, amongst others. *See id.*

From June 22, 2011 through July 6, 2011, the agency's Buffalo District posted a Job Announcement for the position of Program Analyst on the USAjobs.gov website.  *See* IAF, Tab 6, Subtab 4U.  The posting included a statement that the position required specialized experience in retrieving financial

A-3

4

data from computer systems. *See* IAF, Tab 6, Subtab 4U; *see also id.*, Tab 11, stipulation 13.

The appellant applied for the Program Analyst position and as part of her application, she submitted an Official Form (OF) 306, wherein she indicated that in the last ten years, she had been convicted of a misdemeanor as follows:

> 12/30/2008 – pleaded guilty to a misdemeanor in Magistrate Court, 68 Court Street, Buffalo, NY 14202 to Title 18, USC 1030(a)(2)(B), exceeded authorized access of computer, Buffalo Federal Detention Facility, Batavia, NY. No probation or parole – paid fine. Received Certificate of Relief from Disabilities on 12/9/2010.

*Id.*, Tab 6, Subtab 4T.

Effective August 22, 2011, the appellant was hired for the position of Program Analyst. *See id.*, Tab 11, stipulation 15; *see also id.*, Tab 6, Subtab 4S. From August 22, 2011 to February 24, 2012, she was an "employee" as defined by 5 U.S.C. § 7511(a)(1). *See id.*, Tab 11, stipulation 23. Once employed by the Buffalo District, the appellant was able to gain access to the Department of Defense's (DoD) information system by inserting her Common Access Card (CAC), which was provided to her by her employing agency, and by typing in her password into the computer. *See id.*, stipulation 16. The information she had access to through her CAC card included portions of the DoD's Army and U.S. Army Corps of Engineers networks, to which she had been provided access by the agency's Information Technology staff. *See id.* She could also access the Corps of Engineers' financial management system based on the specific permissions that were set up for her. *See id.*, stipulation 17.

As an appointee in the first year of her employment with the Buffalo District, she was subject to an investigation appointment under 5 C.F.R. §§ 731.101 and 731.104. *See id.*, stipulation 18. 5 C.F.R. § 731.103 gives agencies the right to make suitability determinations and take suitability actions against its employees. *See id.*, stipulation 19. Sometime after the appellant was hired by the Buffalo District, it commenced a background investigation under the authority

delegated to it by the Office of Personnel Management (OPM) under 5 C.F.R. § 731.103.

On or about October 17, 2011, Patrick Vanderbeck, Security Manager at the agency, received a request from OPM to report a final adjudication action pertaining to the appellant's background investigation. OPM provided an INV Form 79A, entitled "Report of Agency Adjudicative Action on OPM Personnel Investigations," which stated as follows:

> OPM has not characterized the specific level of severity of the issues in this investigation, but has determined there are potential actionable issue(s) at the minor, moderate, or substantial level which may be disqualifying under suitability/security considerations. You must complete the form and return it to OPM within 90 days.

IAF, Tab 6, Subtab 4P.

In response, Security Manager Vanderbeck commenced an inquiry and determined that there were two incidents during the appellant's prior employment with DHS that merited further investigation into suitability/security considerations relative to the appellant's continued employment. *See id.*, Subtab 4O; *see also* HCD, Security Manager Vanderbeck's testimony. After contacting DHS, Security Manager Vanderbeck obtained two Reports of Investigation (ROIs) relative to the appellant, which confirmed that she had engaged in covert monitoring of her superiors' telephone conversations. *See id.*, Subtabs 4L[2]; 4M.

In response to what Security Manager Vanderbeck had discovered, he provided the appellant's supervisor, Deborah Czombel, Chief, Programs Management Team, with a copy of the reports. Thereafter, Ms. Czombel met with Andrew Bolya, Chief (Chief Bolya), Information Technology, to discuss the degree of risk posed by the appellant's continued employment. Chief Bolya advised Ms. Czombel that the appellant's continued employment posed a

---

[2] Although Security Manager Vanderbeck reviewed the two ROIs, the deciding official only considered the ROI bearing a case number of 200803093. *See* HCD, testimony of Maj Lewton; *see also* IAF, Tab 6, Subtab 4M.

significant threat to information assurance at the agency's Buffalo District, as well as the Department of Defense. *See* HCD, testimonies of Chief Bolya; Security Manager Vanderbeck; Ms. Czombel.

In a letter dated January 5, 2012, Ms. Czombel proposed to remove the appellant for suitability reasons based on the charges of "misconduct or negligence in employment" and "criminal or dishonest conduct." IAF, Tab 6, Subtab 4I. The proposal letter indicated that the appellant's removal was in accordance with 5 C.F.R. §§ 315.401-404 and 5 C.F.R. § 315.805. Attached to the letter were copies of the two ROIs and DoD Directive-Type Memorandum (DTM) 09-206, "Responsible and Effective Use of Internet-based Capabilities." *See id.*, Subtab 4J.

The appellant, through her legal representative, provided a written response to the proposed action on January 27, 2012, in which she did not deny having engaged in the unauthorized covert monitoring of telephone conversations of her superiors at DHS. *See id.*, Subtab 4H; *see also id.*, Tab 11, stipulation 21. However, she asserted therein that she has over twenty-two years of Federal experience, during which time she received outstanding performance evaluations and performance awards. *See id.*, Tab 6, Subtab 4H.

The appellant also stated that during her period of employment with Buffalo District, she was able to demonstrate that she was reliable, hard-working, and an excellent performer. She also indicated that she had never denied the misconduct she was involved in and was remorseful from the outset. In addition, the appellant asserted that the sentence she received from the Federal Magistrate was extremely "light" and because she received a favorable report pertaining to her character and rehabilitation, she was able to obtain a Certificate of Relief from Disabilities in December 2010, which the New York's Board of Parole would not issue unless it was satisfied that it is consistent with rehabilitation efforts and consistent with the public interest. *See id.* In support thereof, the appellant provided a copy of her Certificate of Relief from Disabilities, which

was issued by the New York State Board of Parole, pursuant to State law, New York State Corrections Law Article 23. *See* IAF, Tab 11, stipulation 26.

The appellant also argued that her position with the agency was designated "non-sensitive," which does not require a security clearance. *See id.*, Tab 6, Subtab 4H. Finally, she stated that the misconduct was not recent; she received both formal and informal counseling; there is no threat of repeated misconduct; and there are alternatives to removal. *See id.*

In a letter dated February 10, 2012, Maj Lewton upheld the proposed removal and the appellant was removed effective February 24, 2012. *See id.*, Tab 6, Subtabs 4B; 4C; *see also id.*, Tab 11, stipulation 22. In his decision letter, Maj Lewton acknowledged that the proposing official had erroneously cited to a regulation applicable to probationary employees but stated that he was adopting the proposing official's findings relative to 5 C.F.R. §§ 731.202(b)(1) and (2), and that §§ 731.202(c)(2) − (5) were additional factors supporting the removal. *See id.*, Tab 11, stipulation 25; *see also id.*, Tab 6, Subtab 4C.

Maj Lewton upheld the charges relative to the covert monitoring and indicated that he found the nature and seriousness of the conduct; the circumstances surrounding it; the recency of it; as well as the appellant's age at the time of it; to be additional considerations supporting the removal. *See id.*, Tab 6, Subtab 4C. Although he considered the formal and informal counseling in support of the appellant's efforts toward rehabilitation, he found that it was outweighed by the other considerations supporting the removal. Finally, he indicated that he did not give consideration to the ROI numbered 200804175, *see id.*, Subtab 4L, since the facts listed therein were conflicting. *See id.* This appeal followed. *See id.*, Tab 1.

8

Burden of proof and applicable law

The agency bears the burden of proof by a preponderance of the evidence[3] with regard to suitability determinations. A suitability inquiry involves whether the "character or conduct" of a candidate is such that employing her would adversely affect the efficiency of the service. *See* 5 C.F.R. § 731.101 (2012). "The agency makes its determination on the basis of whether the individual's conduct may reasonably be expected to interfere with, or prevent, efficient service in the position or effective accomplishment by the employing agency of its duties or responsibilities." *Merino v. Department of Justice*, 94 M.S.P.R. 632, ¶ 10 (2003); *see also* 5 C.F.R. § 731.202(a)(1)(2) (2012). The Board has found that it is permissible for an agency to consider public trust in making suitability determinations since the public should not be expected to place trust and confidence in a government employee found guilty of a criminal misdemeanor. *See Richardson v. Resolution Trust Corp.*, 66 M.S.P.R. 302, 311 (1995).

In determining whether a person is suitable for federal employment, the agency must consider specific factors including misconduct or negligence in employment and/or criminal or dishonest conduct. *See* 5 C.F.R. § 731.202(b)(1) and (2) (2012). To the extent relevant, the agency must also give appropriate consideration to the following:

(1) The nature of the position for which the person is applying or in which the person is employed;

(2) The nature and seriousness of the conduct;

(3) The circumstances surrounding the conduct;

(4) The recency of the conduct;

(5) The age of the person involved at the time of the conduct;

---

[3] Preponderant evidence is defined as the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. *See* 5 C.F.R. § 1201.56(c)(2) (2011).

(6) Contributing societal conditions; and

(7) The absence or presence of rehabilitation or efforts toward rehabilitation.

5 C.F.R. § 731.202(c)(1)-(7) (2012).

Notwithstanding the fact that the removal was taken for suitability reasons, since the appellant is an employee as defined by 5 U.S.C. § 7511(a)(1), the removal may only be sustained if both components of the efficiency of the service standard have been established by a preponderance of the evidence: first, that there is a nexus between the appellant's misconduct and the efficiency of the service and second, that the penalty is appropriate. *Aguzie v. Office of Personnel Management*, 116 M.S.P.R. 64, ¶ 32 (2011); *see also Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981).

## The agency has shown by a preponderance of the evidence misconduct or negligence in employment

With regard to the appellant's conduct while employed by DHS's ICE between October 2007 through mid-January 2008, the agency alleged that the appellant engaged in misconduct or negligence in employment as follows:

> A United States Department of Homeland Security Report of Investigation dated January 5, 2009, ..., indicates that while working for Immigration and Customs Enforcement (ICE), you were facing a five-day suspension for insubordination when on numerous occasions, you covertly monitored the telephone calls of senior ICE officials. This led to an investigation by the Department of Homeland Security. During this investigation, you admitted that, although not authorized to monitor private phone conversations to gain information about the ongoing disciplinary actions you configured the phone network to flag extensions of ICE personnel utilizing a covert monitoring feature within the phone system. Specifically, the telephone network was managed via a proprietary computer software package that provided covert monitoring capability to a user with dedicated permissions assignable through the software package. A query of the software's configuration revealed that a user identified as "HEARN" was the only person who possessed

monitoring capability. You admitted that you covertly monitored the private conversations of ICE staff members on the selected extensions. You further admitted that you may have disclosed the intercepted information you secretly obtained to other ICE staff. You were arrested and on 30 December, 2008 pled guilty to one misdemeanor violation of 18 USC 1030(a)(2)(B) and 1030(c)(2)(A) (Fraud and Related Activity in Connection with Computers), which provides that whoever intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any department or agency of the United States, shall be punished by a fine or imprisonment or both.

Further, a United States Department of Homeland Security Report of Investigation dated March 4, 2009, ..., indicates that in a separate incident, you were investigated for unauthorized storage of law enforcement sensitive information and unauthorized use of a personally owed storage device. During the investigation, you admitted that you downloaded data from an ICE computer to a personally owned Universal Serial Bus (USB) flash media device. You used the device in your personally owned, home computer which was connected to the internet. There were approximately 2,700 files on the drive, including a spreadsheet containing personal identification information such as name, address, social security number, and other identifying information for all of the ICE Detention and Removal staff for the Buffalo District. During the investigation you stated that you intended to use the spreadsheet when you transferred from ICE to another position with Customs and Border Protection.

Both of the foregoing reports were obtained during the background investigation required for all new USACE employees.

IAF, Tab 6, Subtab 4I.

In regards to this charge, the appellant provided testimony about the circumstances leading up to her decision to monitor her supervisors' telephonic conversations. She testified that when she was hired by DHS, she and her supervisor had butted heads, which was kept in check up until about May 2006, when her agency was involved in a "Kids Day Operation." As the person responsible for time and attendance, the appellant oversaw timesheets. After the

Kids Day Operation, employees were requesting to be reimbursed for their time during the event – a request the appellant felt was improper since the work was supposed to be on a volunteer basis. Although she allegedly brought this to the attention of her supervisor, she was instructed to key in the requests as overtime or administrative uncontrollable overtime, which she did. HCD, testimony of appellant.

The appellant testified that at that time, the Ethics Officer advised her that she could file an official report if she felt uncomfortable with entering the timesheets as requested. However, she declined to file such a report. Thereafter, she was ostracized by the people in her section since they had corrected their time sheets and were not paid for their time. However, several months later, she was tasked with pulling timesheets for an audit that she believed was related to the Kids Day Operation. She testified that she was not told why the audit was being done, although she was required to do the task, which she did. However, she was allegedly disciplined for failing to complete the assignment and the deciding official for that adverse action was the same person who had been involved in the Kids Day Operation. In other words, he had agreed to pay the employees overtime and uncontrollable overtime for volunteer work. The appellant testified that she did not believe that she would get an unbiased decision pertaining to that decision, at which point she became "pretty angry, distressed, frustrated," and went to her union and the Equal Employment Office, neither of which assisted her. HCD, testimony of appellant.

The appellant testified that when a telephone vendor for the agency came to perform some routine maintenance on the systems, he saw how upset she was and offered to configure the telephone system in such a way as to allow her to monitor her supervisors' conversations. Although she initially declined, she eventually felt so distraught that she agreed to have him configure the system to allow her to listen in on telephone conversations. HCD, testimony of appellant.

According to the appellant, she was not terminated from that position but rather, she received the 5-day suspension and served it, after which she left ICE.

Considering the stipulations reached between the parties, as well as the fact that there is no dispute that the appellant engaged in this misconduct while working for DHS, I find that the agency has proved its charge of misconduct or negligence in employment pertaining to the covert monitoring of the telephone system.

As to the second portion of the charge pertaining to DHS's ROI dated March 4, 2009, because the deciding official did not consider it, and because the agency did not elicit any information about it since it was dropped from the charge, I need not address it here. The Board has held, however, that an agency is required to prove only the essence of its charge, and need not prove each factual specification in support of the charge. *See Aiu v. Department of Justice,* 70 M.S.P.R. 509, 519 (1996), *review reinstated* 95 F.3d 1164 (Fed. Cir. 1996), *aff'd* 98 F.3d 1359 (Fed. Cir. 1996). That is, an agency can meet its burden of proof on its charge on the basis of proof of only one supporting specification. Here, I find that the agency's burden of proof with regard to the charge of misconduct or negligence in employment is nonetheless met.

The agency has shown by a preponderance of the evidence criminal or dishonest conduct

In its second charge, criminal or dishonest conduct, the agency alleged that based on the January 5, 2009 Report, the appellant appeared in U.S. District Court, Western District of New York, on December 30, 2008, and pled guilty to one misdemeanor violation of 18 USC 1030(a)(2)(B) and 1030 (c)(2)(A) (Fraud and Related Activity in Connection with Computers), after which she was sentenced to a $2,500 fine and a $25.00 special assessment with on probation or incarceration. IAF, Tab 6, Subtab 4I. In light of the stipulations reached, and

because the appellant did not dispute this charge, I find that the agency's burden of proof with regard to the charge of criminal or dishonest conduct was met.

<u>The agency established the appellant's unsuitability for employment.</u>

In finding that the appellant was not suitable for her position, the agency primarily relied on the nature of the duties required in her position and the seriousness and recency of the conduct. Ms. Czombel testified that she was the appellant's supervisor and as a Program Analyst, the appellant's duties including the following:

> The basic duties of the position is [sic] to extract, retrieve, and do analysis of data. We use 3 computer systems here. We use P2, which is our scheduling system, we use CEFMS, which is the Corps of Engineers' Financial Management System, and we use OFA, which is our ORACLE Financial Analyzer and that's where we put in our schedules so ... the duties of the position is to extract data from various appropriations, do analysis on it, assist the Project Managers in executing their funds and most of the information here... You need to use computer systems for it.

HCD, testimony of Ms. Czombel.

Referring to the Job Announcement pertaining to the Program Analyst position, Ms. Czombel testified that the appellant was responsible for development and analysis of current and future project programs, providing input and assistance to team leaders who were developing project schedules, resource needs and other program and budgetary requirements, as well as developing, integrating, coordinating and maintaining and monitoring the projects. HCD, testimony of Ms. Czombel; *see also* IAF, Tab 6, Subtab 4U. Ms. Czombel testified that 90% of the work that the appellant did required her to retrieve financial data from the agency's computer systems. Moreover, since she was responsible for coordinating with Project Managers, the appellant needed to use outlook consistently since the email system is required to track suspenses. HCD, testimony of Ms. Czombel.

Ms. Czombel also testified that in the section that she and the appellant worked in, they dealt with two things that are For Official Use Only (FOUO). First, they prepare the "out-year budget" submissions. Hence, the President's budget for the agency is released to the her section prior to his release to the public in February of any given year. The budget is confidential information and releasing it ahead of time would cause embarrassment to the agency. *See* HCD, testimony of Ms. Czombel. Second, they prepare workload to workforce streams or "out-year funding streams," which is also considered FOUO. Since the work involves oversight of the operating budget for the Buffalo District, the appellant would have access to personal information pertaining to employees, including award information. Finally, as appropriations go down, the agency's funding stream can go up and down, which can affect full-time equivalent positions within the district. Ms. Czombel testified that her concern is always that there are legislative issues that they are required to follow and the President's information is pre-decisional, which means it is not available to the public. HCD, testimony of Ms. Czombel.

Maj Lewton's testimony corroborated Ms. Czombel's. He testified that although the appellant's position was classified as "non-sensitive," she would have access to a lot of the agency's data, including its financial, budget, and internet systems, some of which contains FOUO information that could impact the mission of the agency, specifically the agency's information about its own internal practices and regulations and the personal information of employees, the release of which would constitute violations of privacy. He also testified that the agency maintains a lot of information about geological wells and it conducts a lot of testing. Hence, it is important to ensure that the agency's information is protected. *See* HCD, testimony of Maj Lewton.

Maj Lewton also testified that every commander is charged with safeguarding the agency's information systems because the majority of work the agency does is dependent on their effective operation and a failure to protect such

systems could have dire consequences for the agency. For instance, if someone manipulated any of the agency's computer-based systems and introduced a virus, this could result in serious impacts since the Buffalo District is responsible for all kinds of emergency management missions in the region. HCD, testimony of Maj Lewton.

In support of this position, the agency submitted a copy of the Department of Defense's Directive-Type Memorandum 09-026, dated February 25, 2010, which states as follows:

> Commanders at all levels and Heads of DoD components shall continue to defend against malicious activity affecting DoD networks (e.g., distributed denial of service attacks, intrusions) and take immediate and commensurate actions, as required, to safeguard missions (e.g., temporarily limiting access to the Internet to preserve operations security or to address bandwidth constraints).

IAF, Tab 6, Subtab 4J.

DoD Directive 8500.01E, "Information Assurance," was also relied upon by the agency and it defines information assurance as measures that protect and defend information and information systems by ensuring their availability[4], integrity[5], authentication[6], confidentiality, and non-repudiation[7]. It states that it

---

[4] Availability is defined as timely, reliable access to data and information services for authorized users. *See* IAF, Tab 6, Subtab 4G at 15.

[5] Integrity is defined as the quality of an information system reflecting the logical correctness and reliability of the operating system; the logical completeness of the hardware and software implementing the protection mechanisms; and the consistency of the data structures and occurrence of the stored data. *See id.* at 18.

[6] Authentication is a security measure designed to establish the validity of a transmission, message, or originator, or a means of verifying an individual's authorization to receive specific categories of information. *See id.* at 15.

[7] Non-repudiation is assurance the sender of data is provided with proof of delivery and the recipient is provided with proof of the sender's identity, so neither can later deny having processed the data. *See id.* at 20.

is DoD policy that all DoD information systems[8] shall maintain an appropriate level of confidentiality, integrity, authentication, non-repudiation, and availability that reflect a balance among the importance and sensitivity of the information and information assets; documented threats and vulnerabilities; the trustworthiness of users and interconnecting systems; the impact of impairment or destruction of the DoD information system; and cost effectiveness. *See* IAF, Tab 6, Subtab 4G at 3.

This Directive further states that all interconnections of DoD information systems shall be managed to continuously minimize community risk by ensuring that the assurance of one system is not undermined by vulnerabilities of interconnected systems. *See id.* at 5. It also provides that DoD information systems shall be monitored based on the assigned mission assurance category and assessed risk in order to detect, isolate, and react to intrusions, disruption of services, or other incidents that threaten the information assurance of DoD operations or information technology resources, including internal misuse. *See id.* at 7.

DoD Instruction 8500.2, "Information Assurance Implementation," provides that adequate security of DoD information and supporting information technology assets is a fundamental management responsibility. Each DoD component is responsible for implementing and maintaining a program to adequately secure its information and information technology assets. *See id.*, Subtab 4F at 36. It also addresses the same risk management approach as set forth in DoD Directive 8500.01E. *See id.* at 30. This Instruction indicates that authorized users shall observe policies and procedures governing the secure operation and authorized use of a DoD information system. *See id.* at 11. Users

---

[8] DoD information system is defined as a set of information resources organized for the collection, storage, processing, maintenance, use, sharing, dissemination, disposition, display, or transmission of information. *See* IAF, Tab 6, Subtab 4G at 16.

must protect terminals or workstations from unauthorized access and are prohibited from introducing any unauthorized software, firmware or hardware on the DoD information system. *See* IAF, Tab 6, Subtab 4F at 10-11.

Moreover, the agency provided a copy of Army Regulation 25-1, "Army Knowledge Management and Information Technology," which calls for a risk management approach in which each Commander will establish a risk management program which includes, at a minimum, the following:

    a. Risk analysis of resources, controls, vulnerabilities, and threats and the impact of losing the system's capabilities on the mission objective;

    b. Management decision to implement security countermeasures and to mitigate risk; and

    c. Periodic review of the risk management program.

*See id.*, Subtab 4E at 38. Army Regulation 25-1 further requires that the Commander safeguard official records and properly dispose of them per policy guidance. *See id.* at 81. It also states that interconnected systems create shared risks and vulnerabilities where an intruder has only to penetrate the weakest link in order to exploit the entire network. *See id.* at 36.

Army Regulation 25-2, "Information Assurance," also provides that Commanders will be responsible for implementing the Army Information Assurance Program in their command or activity, and operating and maintaining systems within their command in compliance with the Regulation. *See id.*, Subtab 4D at 16. It also prohibits the use of information systems for unauthorized activities and prohibits the installation of software, configuration, or modification of an information system in an unauthorized manner. *See id.* at 28. In addition, it prohibits the release, disclosure, transfer or possession or alteration of information without the consent of the data owner, the individual's supervisory chain of command, Freedom of Information Act (FOIA) Official, Public Affairs Office, or disclosure officer's approval. *See id.*

18

Finally, under this Regulation, information assurance personnel are required to validate individual security investigation (or approve interim access) requirements before authorizing information system access by any user. *See* IAF, Tab 6, Subtab 4D at 28. Commanders are required to verify that information assurance personnel conduct initial and continual assessments to detect information system network vulnerabilities using approved tools, tactics, and techniques to facilitate the risk management process and to ensure compliance with network management and security policies and procedures. *See id.* at 31. They are also required to establish procedures to manage and control access to all information systems, networks, and network equipment to ensure integrity, confidentiality, availability, non-repudiation and authentication, regardless of classification level. They must also verify, and information assurance personnel must deny physical and logical access to individuals who cannot meet access requirements. *See id.* at 44.

Maj Lewton testified that he became aware of concerns surrounding the appellant's suitability for the position when Security Manager Vanderbeck approached him sometime in August 2011 and told him that the appellant's background investigation had been flagged, although it was unclear why. HCD, testimony of Maj Lewton. Afterwards, he waited for Security Manager Vanderbeck to obtain additional details about the circumstances leading up to her investigation being flagged, after which the ROIs were provided in October or November 2011. *See id.*; *see also* IAF, Tab 6, Subtabs 4L; 4M. After Maj Lewton obtained the ROIs from Security Manager Vanderbeck, he met with the agency's legal representative, with Chief Bolya, and Ms. Czombel, to determine the risks involved by keeping the appellant employed. Ms. Czombel was then given the ROIs as well. HCD, testimony of Maj Lewton.

In October or November 2011, Chief Bolya provided him with the relevant regulations referred to above pertaining to information. Maj Lewton testified at length about his responsibilities in this regard and testified he has a responsibility

to evaluate and assess the trustworthiness of the inter-connecting systems and of the agency's users, ensuring that he must be able to trust his personnel. In so doing, it is important for him to consider whether anyone in his organization is a potential threat to the network. Then, he must assess what is required in order to ensure that breaches to the system do not occur. Chief Bolya also testified that everyone is bound by the DoD directives, instructions, and Department of the Army regulations. HCD, testimony of Chief Bolya. In light of the above, Chief Bolya advised him that the risk was too high and therefore, they should evaluate the various options that the agency had pertaining to the appellant's employment. HCD, testimony of Maj Lewton; testimony of Chief Bolya.

Maj Lewton testified that because the Program Analyst position involves a lot of stress, he would not want to have to worry about the appellant eavesdropping on her supervisor or engaging in similar misconduct in the future. He was concerned because the appellant admitted to having monitored the telephone system because she was stressed over a potential 5-day suspension action. HCD, testimony of Maj Lewton. Moreover, the deciding official opined that in light of the appellant's lengthy Federal employment, i.e., over twenty years, she should have known better. HCD, testimony of Maj Lewton.

Maj Lewton also testified that although he considered the appellant's Certificate of Relief from Disabilities, he could not, based on the agency's core values, as well as the suitability factors, accept the risk involved with keeping her on board since he believed that she was not a good fit for the Buffalo District. He also considered the potential for embarrassment and nature and seriousness of the misconduct, which in his mind, outweighed the other factors.

Finally, Maj Newton testified that the conduct was recent. The Board has held that misconduct is considered "quite recent" when a criminal offense occurs only three years before the agency's unsuitability finding. *See Merino*, 94 M.S.P.R. 632, ¶ 12, quoting *Buhl v. Office of Personnel Management*, 37 M.S.P.R. 305, 313 (1988). Here, although the appellant's misdemeanor charge

may not have been a criminal offense, it is nonetheless indicative of her unsuitability for employment, especially in light of the fact that it occurred just 3 years before the agency's unsuitability finding.

I have considered the appellant's argument that the agency could not find her unsuitable for the Program Analyst position in light of the fact that Ms. Czombel, who was on the selection panel when the appellant was selected for the position, was aware of the fact that the appellant had pled guilty to the misdemeanor charge involving the telephone monitoring.[9] In support of her contention in the regard, the appellant testified that in order for her to receive a Certificate of Relief from Disabilities, she had to provide two references, one of whom was Ms. Czombel. She testified that because Ms. Czombel was aware of the circumstances leading up to her guilty plea, had the agency really believed she posed a threat to its information systems, Ms. Czombel would not have recommended her selection for the position.

The appellant testified that she had many conversations about the telephone monitoring with Ms. Czombel and Ms. Czombel was therefore aware of her guilty plea before a Federal Magistrate. She testified that she and Ms. Czombel were close friends and they used to vent to each other about work. HCD, testimony of appellant.

On the other hand, Ms. Czombel testified that although she knew that the appellant had left DHS because of problems with her supervisor, she was not aware that she had pled guilty to a misdemeanor in Federal court. During cross-examination, Ms. Czombel testified that she was aware that the appellant had disagreements with her supervisor on numerous occasions and was concerned about the fact that she was going to be disciplined at some point. She did she recall having spoken to the appellant's parole officer in support of the appellant's

---

[9] The appellant did not raise this claim as an affirmative defense of harmful procedural error.

Certificate of Relief from Disabilities. Finally, she did not deny having met with the appellant and another co-worker on two occasions. However, she testified that she did so while the appellant was still employed at DHS in Batavia, which was before she pled guilty to the misdemeanor. HCD, testimony of appellant.

To resolve credibility issues, the Board has charged administrative judges with identifying the factual issues in dispute, summarizing all the evidence on each disputed question of fact, state which version is believed, and explain in detail why the chosen version is more credible than the other version or versions of events. *See Brulotte v. U.S. Postal Service*, 44 M.S.P.R. 283 (1990); *Hillen v. Department of the Army*, 35 M.S.P.R. 453 (1987). Some of the factors to be considered in assessing the credibility of a witness are: (1) The witness's character; (2) any prior inconsistent statement by the witness; (3) the witness's bias, or lack of bias; (4) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (5) the inherent improbability of the witness's version of events; (6) the witness's opportunity and capacity to observe the event or act in question; and (7) the witness's demeanor. *See Hosler v. Veterans Administration*, 42 M.S.P.R. 265, 267 (1989); *Sternberg v. Department of Defense, Dependents Schools*, 41 M.S.P.R. 46, 54 (1989); *Hillen*, at 458.

Here, I find that Ms. Czombel's testimony is more credible. Although the appellant testified that she gave the parole officer Ms. Czombel's name as a reference, when asked whether the parole officer told the appellant that he had spoken to Ms. Czombel, she testified that he only told her that he was going to, and that Ms. Czombel told her she had spoken to him.

The appellant also testified that her misdemeanor did not come up during the interview for the Program Analyst position and the next time it did come up was on August 8, 2011, when she brought it to Security Manager Vanderbeck's attention when she was being fingerprinted that day.

Based on all of the above, I find that the agency proved by preponderant evidence that the appellant engaged in serious misconduct or negligence in employment and criminal or dishonest conduct. I also find that based on the appellant's admissions and the record evidence, that it was reasonable for the deciding official to determine that the appellant's prior misconduct may interfere with, or prevent, efficient service in her position or effective accomplishment by the employing agency of its duties or responsibilities. Thus, I find no reason to overturn the agency's finding of unsuitability due to misconduct or negligence in employment and criminal or dishonest conduct.

The agency has proven that its action promotes the efficiency of the service.

To sustain a charge of misconduct, the agency must have established by preponderant evidence the existence of a nexus between the employee's misconduct and the work of the agency, i.e., the agency's performance of its functions. *See Doe v. Department of Justice,* 565 F.3d 1375, 1379 (Fed. Cir. 2009); *Brown v. Department of the Navy,* 229 F.3d 1356, 1358 (Fed. Cir. 2000) (citing *Mings v. Department of Justice,* 813 F.2d 384, 389-90 (Fed. Cir. 1987)). The agency has the burden of proof to establish that the employee's discipline will "promote the efficiency of the service."

The nexus requirement, for purposes of whether an agency has shown that its action promotes the efficiency of the service, means there must be a clear and direct relationship between the articulated grounds for an adverse action and either the employee's ability to accomplish his or her duties satisfactorily or some other legitimate government interest. *See Johnson v. Department of Health & Human Services,* 86 M.S.P.R. 501, *review dismissed Case v. Department of Health & Human Services,* 243 F.3d 565 (2000); *Merritt v. Department of Justice,* 6 M.S.P.R. 585, 596 (1981), *modified, Kruger v. Department of Justice,* 32 M.S.P.R. 71, 75 n.2 (1987). To the extent that not receiving a favorable background adjudication can be considered on-duty or work-based conduct, it

necessarily has a connection to the work of the agency. *See Parker v. U.S. Postal Service*, 819 F.2d 1113, 1116 (Fed. Cir. 1987); *Coleman v. U.S. Postal Service,* 57 M.S.P.R. 537, 543 (1993).

Moreover, Maj Lewton testified that since the agency has a relationship with the public, if any information was released through future misconduct by the appellant, it could cause potential embarrassment to the agency. If someone wanted to eavesdrop on the agency, misconduct similar to what the appellant engaged in while working from DHS could create a "backdoor" into which viruses could infect the agency's system, potentially impacting its mission. The loss of information could cause embarrassment and hamper relationships with the public and local stakeholders. HCD, testimony of Maj Lewton.

Maj Lewton also testified that in his mind, the appellant's misconduct goes against the agency's values. First, she violated the core values of loyalty, truth and allegiance to her country and leaders since, in response to a disagreement that she had with her supervisor involving a disciplinary action, she decided to conduct telephone monitoring rather than utilize the proper channels if she in fact believed she was being targeted as alleged. Second, her actions were not honorable. Her conduct also violated the core value of integrity since what she did was deceitful. HCD, testimony of Maj Lewton.

Finally, Maj Lewton testified that although DHS's computer network was not manipulated, if the appellant did this again by authorizing someone else to use the agency's computer systems, there is a risk that someone would get DoD information, which in turn could cripple or disrupt the agency. HCD, testimony of Maj Lewton. In light of all of the above, I find that the agency has shown the necessary nexus.

## The selected penalty is within the bounds of reasonableness

The Board recognizes that it must accord proper deference to the agency's primary discretion in managing its work force. *See Douglas*, 5 M.S.P.R. 280 at 306. The Board's function with regard to its review of an agency's penalty selection is not to displace management's responsibility, but to determine whether management exercised its judgment within the tolerable limits of reasonableness. *Gray v. U.S. Postal Service*, 97 M.S.P.R. 617 ¶ 11 (2004); *Carlton v. Department of Justice*, 95 M.S.P.R. 633 ¶ 6, *review dismissed*, 115 Fed. Appx. 430 (Fed. Cir. 2004). Therefore, the Board's role in this process is not to insist that the balance be struck precisely where the Board would choose to strike it if the Board were in the agency's shoes, but merely to insure that a responsible balance was struck. *Douglas*, 5 M.S.P.R. at 306.

The factors generally recognized as relevant for consideration in determining the appropriateness of a penalty are set forth in the *Douglas* decision. While they are not exhaustive or pertinent in every case, they do serve as general guidelines:

(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

(2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

(3) the employee's past disciplinary record;

(4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;

(6) consistency of the penalty with those imposed upon other employees for the same or similar offense;

(7) consistency of the penalty with any applicable agency table of penalties;

(8) the notoriety of the offense or its impact upon the reputation of the agency;

(9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

(10) potential for the employee's rehabilitation;

(11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

(12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

*See Douglas*, 5 M.S.P.R. at 305-306.

Here, the deciding official testified that although he initially believed that the appellant was a probationer, he was advised, through the agency's legal representative, that she was indeed an "employee" entitled to rights under 5 U.S.C. chapter 75. Thus, he testified that prior to rendering his decision, he considered all of the *Douglas* factors, although some of them did not apply. HCD, testimony of Maj Lewton. First, he considered the fact that the offense was serious, intentionally committed for gain, and frequently repeated over the course of a couple of months.

He also testified that although he had not disciplined any other employee for similar misconduct, and was unsure whether DHS at the time of the appellant's misconduct, had placed her on notice that her conduct was prohibited, any options short of removal were not available to him because the appellant's access to all of the agency's computer systems could not be limited and her position, like the majority of positions within the Buffalo District, requires access to all of the agency's systems. *See id.*

Chief Bolya's testimony corroborated the deciding official's in this regard since he testified that when approached by Maj Lewton to seek his guidance,

Chief Bolya advised him that there was no way to mitigate the risk since the CAC card had already been issued to the appellant. Finally, he testified that he and Maj Lewton discussed options short of the appellant's removal but because 99.9% of the work they do is done through the automated information system, there was no way to provide her with limited access to the agency's computers and removal seemed to be the only viable option. HCD, testimony of Chief Bolya.

The appellant argued that the deciding official did not conduct a *Douglas* factor analysis because he failed to document it and the decision to remove letter failed to mention the *Douglas* factors. Nevertheless, even assuming without finding that Maj Lewton did not conduct a such an analysis, in cases where a deciding official has failed to consider the relevant *Douglas* factors, the Board will review the record and give the appropriate factors due consideration.

In determining the propriety of a penalty, however, the Board places primary importance upon the nature and seriousness of the offense, and its relation to the appellant's duties, position, and responsibilities, including whether the offense was intentional or frequently repeated. *See Bahrke v. U.S. Postal Service*, 98 M.S.P.R. 513, 523 ¶ 24 (2005); *Zayer v. Department of Veterans Affairs*, 90 M.S.P.R. 51, ¶ 9 (2001). It cannot be ignored that the appellant stipulated that she pled guilty to the misdemeanor charge surrounding her unauthorized access to DHS's telephone system while working there.

Moreover, I am not persuaded by the appellant's argument that alternative sanctions were not considered or, that the agency did not believe that the appellant posed a threat to its network in light of the fact that it waited until after the holidays to issue its proposed action. On the contrary, both Maj Lewton and Chief Bolya testified that actions were taken to safeguard the agency's computer systems while the appellant remained there. For instance, Chief Bolya testified that he recommended to Maj Lewton and Security Manager Vanderbeck, that the appellant's access be revoked, after which it was restricted to some of the directories and her around November or December 2011, her account was

27

suspended so that she could not access it externally through VPN connections and connectivity was shut down. The appellant was also required to return her CAC card. HCD, testimony of Chief Bolya.

As to the appellant's suggestion that the agency should have monitored the appellant's computer access on a continuous basis to ensure that she was not exceeding her authority on the agency's network systems, when asked whether this was feasible, Chief Bolya testified that there is no manpower to continuously monitor the appellant. *See id.*

I have also considered the appellant's argument that the agency was prohibited from taking an adverse action against her in light of the deciding official's failure to document his *Douglas* factor analysis. In support of the appellant's position, she provided a document entitled, "Adverse Actions – Guidance for Deciding Officials," which states, in relevant part at paragraph 10, as follows:

> Document your decision in a memorandum and attached [sic] your Douglas Factor Analysis. You should complete the linked checklist and hand carried [sic] to your servicing CPAC specialist along with the following:
>
> a. The employee's written reply, if any.
>
> b. The MFR (signed by the employee) documenting the substance of any oral reply.

IAF, Tab 8, Subtab R. However, Maj Lewton testified that although a written Douglas factor analysis is recommended, it is not required. HCD, testimony of Maj Lewton. Consequently, given the nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities as a Program Analyst, including the fact that the offense was intentional and repeated, I find that removal is within the bounds of reasonableness.

The appellant failed to prove that the agency treated her disparately in selecting the penalty of removal.

The appellant's allegations at the hearing that the agency treated her disparately to other employees, without a claim of prohibited discrimination, is claim of disparate penalties for which the appellant bears the burden of proof, but is not an affirmative defense. *See Vargas v. U.S. Postal Service*, 83 M.S.P.R. 695, ¶ 9 (1999) (citing *Jefferies v. Department of the Navy*, 78 M.S.P.R. 255, 261 (1998)). To establish disparate penalties, an appellant "must show that the charges and the circumstances surrounding the charged behavior are substantially similar." *Lewis v. Department of Veterans Affairs*, 113 M.S.P.R. 657, ¶ 6 (2010) (citing *Archuleta v. Department of the Air Force*, 16 M.S.P.R. 404, 407 (1983)). If she does so, "the agency must prove a legitimate reason for the difference in treatment by a preponderance of the evidence before the penalty can be upheld." *Id.*

In this regard, the appellant testified that there were other employees who were involved in misconduct similar to her own, although they were not removed. Specifically, she testified that there were three people who were charged with having viewed pornography on their office computers, although they were not removed. She testified that one employee received a one-month suspension for having used the agency's server space for a personal business while at work. However, during cross-examination, the appellant acknowledged that the only information she received pertaining to the discipline involving the pornography was based on a rumor she heard. She also acknowledged that her contention that another employee was not disciplined for using the agency's server space for a personal business was based on a rumor. HCD, testimony of appellant.

As explained by the Board in *Lewis*, to trigger the agency's burden to prove a legitimate reason for disparate treatment, there must be a great deal of similarity between the circumstances surrounding each of the employees' adverse actions, as follows:

> not only between the offenses committed by the appellant and a
> proposed comparator, but as to other factors, such as whether the
> employees were in the same work unit, had the same supervisor
> and/or deciding official, and whether the events occurred relatively
> close in time.

*Lewis*, 113 M.S.P.R. 657, ¶ 12.   In the past, whether an appellant and a comparator were in the same work unit, among other factors, was outcome determinative; if they were not, the Board would not find a disparate penalty. *Id.*

However, the U.S. Court of Appeals has held that while the fact that different employees are supervised under different chains of command may sometimes justify different penalties, the factual record must be fully developed with respect to the agency's actions, to show why different chains of command would justify different penalties. *See Williams v. Social Security Administration*, 586 F.3d 1365, 1368-69 (Fed. Cir. 2009).   Consistent with the court's holding in *Williams*, the Board in *Lewis* held that there must be enough similarity between the nature of the misconduct and other factors, leading a reasonable person to conclude that the agency treated similarly-situated employees differently; however, it indicated that it would not have hard and fast rules regarding the "outcome determinative" nature of these factors. *See Lewis*, 113 M.S.P.R. 657, ¶ 6.

Here, I find that the appellant failed to show that the other employees were similarly situated or, that she was treated disparately by the agency in selecting the penalty of removal.   She did not establish that the offenses committed by these other employees were comparable in nature, or that they were in fact committed in the first place since the information she received was "based on rumor."   It is well-settled that where an imposed penalty is appropriate for the sustained charge, an allegation of disparate penalties is not a basis for reversal or mitigation of the penalty unless the agency knowingly treated similarly-situated employees differently or began levying a more severe penalty for a certain offense without giving notice of the change in policy. *Facer v. Department of the*

*Air Force*, 836 F.2d 535, 539 (Fed. Cir. 1988); *Social Security Administration v. Mills*, 73 M.S.P.R. 463, 473 (1996), *aff'd*, 124 F.3d 228 (Fed. Cir. 1997) (Table).

Based on the foregoing, I find that the deciding official considered relevant factors and exercised his discretion within tolerable limits of reasonableness. *Douglas*, 5 M.S.P.R. at 306. Notwithstanding the appellant's years of service, I find that given the seriousness of the misconduct, removal is the maximum reasonable penalty. Hence, I find no basis to disturb the agency's chosen penalty based on the sustained charges. I therefore find the agency's decision to remove the appellant did not exceed the tolerable limits of reasonableness. *See Cameron v. Department of Justice*, 100 M.S.P.R. 477, ¶ 11 (2005). Accordingly, I find that the agency-imposed penalty supports the efficiency of the service and was reasonable. Consequently, the agency's penalty of removal will not be disturbed.

## DECISION

The agency's removal action is AFFIRMED.

FOR THE BOARD:

Maria M. Dominguez
Administrative Judge

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the administrative judge may vacate the initial decision in order to accept a settlement agreement into the record. *See* 5 C.F.R. § 1201.112(a)(5).

## NOTICE TO APPELLANT

This initial decision will become final on **August 21, 2012**, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you

received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file your petition with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days

after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

## JUDICIAL REVIEW

If you are dissatisfied with the Board's final decision, you may file a petition with:

> The United States Court of Appeals
> for the Federal Circuit
> 717 Madison Place, NW.
> Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be received by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read

this law, as well as review the Board's regulations and other related material, at our website, http://www.mspb.gov. Additional information is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

# CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail

Paula Jo Hearn
29 Plumb Creek Trail
Lancaster, NY 14086

<u>Appellant Representative</u>

U.S. Mail

Andrew P. Fleming, Esq.
Chiacchia & Fleming, LLP
5113 South Park Avenue
Hamburg, NY 14075

<u>Agency Representative</u>

Electronic Mail

Bryan E. Miller, Esq.
Department of the Army
Corps of Engineers
Office of Counsel
1776 Niagara Street
Buffalo, NY 14207

July 17, 2012
(Date)

Maria Dominguez For
Anthony Williams
Legal Assistant

## United States Court of Appeals
## for the Federal Circuit

### CERTIFICATE OF SERVICE

I, Natasha S. Johnson, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by Counsel for Petitioner to print this document. I am an employee of Counsel Press.

On December 30, 2013, Counsel for Petitioner has authorized me to electronically file the foregoing **Brief for Petitioner** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Natasha S. Johnson
Natasha S. Johnson

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: this brief contains 12,901 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). In making this assertion I have relied upon the word count of the word processing program used to prepare the brief.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2000 in Times New Roman, 14-point font.

Dated:    December 30, 2013
          Hamburg, New York

                            /s/ Christen Archer Pierrot
                            Christen Archer Pierrot, Esq.
                            CHIACCHIA & FLEMING, LLP
                            Attorneys for Appellant, Carol Kaplan
                            5113 South Park Avenue
                            Hamburg, New York 14075
                            Tel: 716-648-3030
                            E-Mail: cap@cf-legal.com